| | | |
|---|---|---|
| David W. Scofield - 4140<br>**PETERS \| SCOFIELD**<br>*A Professional Corporation*<br>7430 Creek Road, Suite 303<br>Sandy, Utah 84093-6160<br>Telephone: (801) 322-2002 Ext. 102<br>Direct Dial: (801) 858-3402<br>Toll Free: (888) 296-3998<br>Facsimile: (801) 912-0320<br>Email: dws@psplawyers.com | **POMERANTZ LLP**<br>Jeremy A. Lieberman<br>(Pro Hac Vice Pending)<br>J. Alexander Hood II<br>(Pro Hac Vice Pending)<br>600 Third Avenue, 20th Floor<br>New York, New York 10016<br>Telephone: (212) 661-1100<br>Facsimile: (212) 661-8665<br>Email: jalieberman@pomlaw.com<br>Email: ahood@pomlaw.com | **POMERANTZ LLP**<br>Patrick V. Dahlstrom<br>(Pro Hac Vice Pending)<br>10 South La Salle Street, Suite 3505<br>Chicago, Illinois 60603<br>Telephone: (312) 377-1181<br>Facsimile: (312) 377-1184<br>Email: pdahlstrom@pomlaw.com |

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| JARRETT PATTON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DOMO, INC., JOSHUA G. JAMES, BRUCE FELT, FRASER BULLOCK, MATTHEW R. COHLER, DANA EVAN, MARK GORENBERG, NEHAL RAJ, and GLENN SOLOMON,<br><br>Defendants. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br>Civil No. 2:19-cv-00781-DAK<br><br>Honorable Dale A. Kimball<br>United States District Judge |

## INTRODUCTION

Plaintiff Jarrett Patton ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted

by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Domo, Inc. ("Domo" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Domo common stock pursuant and/or traceable to the Company's initial public offering ("IPO" or "Offering") commenced on or around June 29, 2018; or (b) Domo securities between June 28, 2018 and September 5, 2019, both dates inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Domo was founded in 2010 and is headquartered in American Fork, Utah.  The Company was formerly known as Domo Technologies, Inc. and changed its name to Domo, Inc. in December 2011.  The Company operates a cloud-based platform in the United States that purportedly digitally connects everyone from the chief executive officer to the frontline employee with the people, data, and systems in an organization, giving them access to real-time data and insights, and allowing them to manage business from smartphones.

3.      On June 1, 2018, Domo filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after amendment, was declared effective by the SEC on June 28, 2018 (the "Registration Statement").

4.      On June 29, 2018, Domo filed a prospectus in connection with the IPO on Form 424B4 (the "Prospectus"), which incorporated and formed part of the Registration Statement (collectively, the "Offering Documents").

5.      On or around June 29, 2018, pursuant to the IPO, Domo's Class B common stock began trading on the Nasdaq Global Market ("NASDAQ").

6.      On July 3, 2018, Domo closed the IPO, in which the Company issued and sold 10,580,000 shares of Class B common stock at $21.00 per share for aggregate net proceeds of $202.5 million, after deducting underwriters' discounts and offering expenses payable by the Company.

7.      The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) Domo was experiencing weakness in its enterprise and international businesses; (ii) Domo's billings growth had dramatically slowed; (iii) all of the foregoing was reasonably likely to have a material negative impact on the Company's financial results; and (iv) as a result, the Offering Documents were materially false and/or misleading and

failed to state information required to be stated therein and the Company's public statements were materially false and misleading at all relevant times.

8.      On September 5, 2019, during after-market hours, Domo issued a press release announcing its financial results for the second quarter of 2020.  Although Domo reported positive earnings news, the Company also provided guidance for the third quarter and full fiscal year 2020 that fell short of market expectations.  Specifically, Defendants revealed to investors that they expected third quarter revenue of $41.5-42.5 million versus a consensus of $44.2 million, and a loss of $1.04-1.00 per share versus a consensus of a $0.91 loss per share.  Additionally, Defendants revealed a full year 2020 view with revenue of $168-169 million versus a consensus of $173.7 million, and a loss of $4.10-4.00 per share versus a consensus of a $3.82 loss per share.

9.      Then, on September 6, 2019, during pre-market hours, JMP Securities ("JMP") dropped its Domo target by $10.00 to $37.00, citing the "disappointing" report and guidance, weakness in Domo's enterprise and international businesses, and billings growth that was about half of what was expected.

10.      On this news, Domo's stock price fell $9.44 per share, or 37.45%, to close at $15.77 per share on September 6, 2019, or 24.9% below the IPO price of $21.00.

11.      As of the time this complaint was filed, the price of Domo common stock continues to trade below the IPO price, damaging investors.

12.       As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Domo's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.     Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Domo is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Plaintiff, as set forth in the attached Certification, purchased Domo securities pursuant and/or traceable to the Offering Documents issued in connection with the Company's IPO, and/or purchased or otherwise acquired Domo securities at artificially inflated prices during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.     Defendant Domo is a Delaware corporation with principal executive offices located at 772 East Utah Valley Drive, American Fork, UT 84003.  Domo's common stock trades on the NASDAQ under the ticker symbol "DOMO."

19.     Defendant Joshua G. James ("James") served as Domo's Founder, Chief Executive Officer, and a Director at all relevant times.  James signed or authorized the signing of the Offering Documents filed with the SEC.

20.     Defendant Bruce Felt ("Felt") served as Domo's Chief Financial Officer at all relevant times.  Felt signed or authorized the signing of the Offering Documents filed with the SEC.

21.     Defendants James and Felt are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

22.     The Exchange Act Individual Defendants possessed the power and authority to control the contents of Domo's SEC filings, press releases, and other market communications.  The Exchange Act Individual Defendants were provided with copies of Domo's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Domo, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

23.     Domo and the Exchange Act Individual Defendants are sometimes referred to herein collectively as the "Exchange Act Defendants."

24.     Defendant Fraser Bullock ("Bullock") served as a Director of Domo at all relevant times.  Bullock signed or authorized the signing of the Offering Documents filed with the SEC.

25.     Defendant Matthew R. Cohler ("Cohler") served as a Director of Domo at all relevant times.  Cohler signed or authorized the signing of the Offering Documents filed with the SEC.

26.     Defendant Dana Evan ("Evan") served as a Director of Domo at all relevant times.  Evan signed or authorized the signing of the Offering Documents filed with the SEC.

27.     Defendant Mark Gorenberg ("Gorenberg") served as a Director of Domo at all relevant times.  Gorenberg signed or authorized the signing of the Offering Documents filed with the SEC.

28.     Defendant Nehal Raj ("Raj") served as a Director of Domo at all relevant times.  Raj signed or authorized the signing of the Offering Documents filed with the SEC.

29.     Defendant Glenn Solomon ("Solomon") served as a Director of Domo at all relevant times.  Solomon signed or authorized the signing of the Offering Documents filed with the SEC.

30.     Defendants James, Felt, Bullock, Cohler, Evan, Gorenberg, Raj, and Solomon are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

31.     As directors, executive officers and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Domo stock in the IPO for their own benefit and the benefit of Domo.  The Securities Act Individual Defendants were key members of the IPO working group and executives of Domo who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

32.     The Exchange Act Defendants and the Securities Act Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

33.     Domo was founded in 2010 and is headquartered in American Fork, Utah.  The Company was formerly known as Domo Technologies, Inc. and changed its name to Domo, Inc. in December 2011.  The Company operates a cloud-based platform in the United States that purportedly digitally connects everyone from the chief executive officer to the frontline employee with the people, data, and systems in an organization, giving them access to real-time data and insights, and allowing them to manage business from smartphones.

34.     On June 1, 2018, Domo filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after amendment, was declared effective by the SEC on June 28, 2018.

35.     On June 29, 2018, Domo filed a prospectus in connection with the IPO on Form 424B4, which incorporated and formed part of the Registration Statement.

36.     On or around June 29, 2018, pursuant to the IPO, Domo's Class B common stock began trading on the NASDAQ.

37.      On July 3, 2018, Domo closed the IPO, in which the Company issued and sold 10,580,000 shares of Class B common stock at $21.00 per share for aggregate net proceeds of $202.5 million, after deducting underwriters' discounts and offering expenses payable by the Company.

**Materially False and Misleading Statements Issued in the Offering Documents**

38.     For Domo's fiscal year ended January 31, 2018, the Offering Documents reported a net loss of $176.56 million, or $110.70 per diluted share, on revenue of $108.52 million, compared to a net loss of $183.12 million, or $124.90 per diluted share, on revenue of $74.54 million for the Company's fiscal year ended January 31, 2017.  The Offering Documents also noted that its total number of customers increased from 1,199 in fiscal 2017 to 1,521 in fiscal 2018, and that billings had increased from $92.41 million in fiscal 2017 to $129.54 million in fiscal 2018.

39.     Additionally, the Offering Documents discussed the percentage of revenue Domo historically derived from its customers with United States addresses versus its international customers, touting the Company's increased focus on expanding its international footprint.  For example, the Offering Documents noted that "[i]n the fiscal years ended January 31, 2017 and 2018 and the three months ended April 30, 2017 and 2018, [Domo] derived 86%, 82%, 83% and 79%, respectively, of [its] revenue from customers with billing addresses in the United States; however, [Defendants] are focused on growing [Domo's] international business and will continue to invest in sales operations outside the United States."

40.     The Offering Documents also highlighted the Company's "***Proven Enterprise Readiness***"[1] as one of Domo's competitive strengths.  In support of this, the Offering Documents asserted that Domo "ha[d] invested significantly to broaden [its] platform capabilities and enhance security and scalability requirements for the enterprise."  In this regard, the Offering Documents also asserted that Domo's "enterprise customer base has grown from 36 as of January 31, 2014, to 385 as of April 30, 2018, representing a compound annual growth rate, or CAGR, of 75%," that the Company's "customer base includes 36% of the 2017 Fortune 50 as of the date of this

---

[1] All emphases are as they appear in the original statements unless indicated otherwise.

prospectus," and that the Company was "investing in [its] field sales team to further increase [its] focus on attracting new enterprise customers and expanding [its] footprint within [its] current enterprise customers."

41.     Additionally, in discussing Domo's key business metrics, the Offering Documents touted the quality, number, and growth of Domo's customer base, stating, in relevant part:

> We believe that our ability to expand our customer base is an important indicator of market penetration, the growth of our business, and future business opportunities. We define a customer at the end of any particular quarter as an entity that generated revenue greater than $2,500 during that quarter . . . . In addition to our increase in total customers, as of April 30, 2018, we had 385 enterprise customers, representing a compound annual growth rate of 75% from January 31, 2014. For the years ended January 31, 2017 and 2018 and the three months ended April 30, 2017 and 2018, no single customer accounted for more than 10% of our total revenue, nor did any single organization when accounting for multiple subsidiaries or divisions which may have been invoiced separately.

42.     In discussing Domo's billings as a key business metric, the Offering Documents stated that "[b]illings represent [the Company's] total revenue plus the change in deferred revenue in a period," and that "[b]illings reflect sales to new customers plus subscription renewals and upsells to existing customers, and represent amounts invoiced for subscription, support and professional services."  In this respect, the Offering Documents stated that the Company "typically invoice[s] customers in advance in annual installments for subscriptions to [its] platform," and generally warned that "[b]ecause [the Company] generate[s] most of [its] revenue from customers who are invoiced on an annual basis and have a wide range of annual contract values, [the Company] may experience variability due to typical enterprise buying patterns and timing of large renewals."  This warning was plainly a general "catch-all" provision that was not tailored to Domo's actual known risks with respect to slowed billings growth.

43.     Additionally, the Offering Documents touted the purported historical strength of Domo's enterprise business's revenue and subscription retention rates over the past several years,

signaling to investors that the Company had been experiencing a period of rapid growth.  For

example, the Offering Documents stated, in relevant part:

> As of April 30, 2018, we had more than 1,500 organizations as customers, including 385 customers with more than $1 billion in revenue, which we refer to as enterprise customers. For the fiscal years ended January 31, 2017 and 2018 and the three months ended April 30, 2017 and 2018, our enterprise customers accounted for 47%, 46%, 46% and 46% of our revenue for such periods, respectively. We employ a land-and-expand business model and typically enter into enterprises within a specific division or for a specific use case. As our users see the value of our platform, we expand our footprint within the enterprise . . . . As of January 31, 2018, for the cohort of enterprise customers that licensed our product in the fiscal year ended January 31, 2015, the current annual contract value, or ACV, was 186% of the original license value, compared to 129% and 160% for the cohorts of enterprise customers that subscribed to our platform in the fiscal years ended January 31, 2016 and 2017, respectively . . . . In addition, over the fiscal year ended January 31, 2018, our subscription net revenue retention rate, which compares the subscription revenue generated from a cohort of customers that generated subscription revenue at the beginning of the same period in consecutive fiscal years (excluding customers from the cohort who canceled during the initial period), was over 100%, 115% and 95% for all customers, enterprise customers and non-enterprise customers, respectively. For the three months ended April 30, 2018, our subscription net revenue retention rates were 105%, 115% and 98% for all customers, enterprise customers and non-enterprise customers, respectively, compared to 101%, 108% and 95% for the three months ended April 30, 2017.

44.     In this respect, the Offering Documents also touted that Defendants "believe we

are extremely well-poised to capitalize on global digital transformation, creating more competitive

organizations built on data-centric, connected and collaborative workforces," and that Defendants

"ha[d] assembled an experienced management team to execute on this global opportunity."

45.     The Offering Documents also touted Domo's international go-to market

partnerships, which purportedly aided in driving the Company's growth.  For example, the

Offering Documents stated that Defendants "have . . . developed go-to-market partnerships with a

number of key technology, system integrator and consultant partners . . . internationally to help

customers and potential customers validate our solutions and provide introductions to potential

customers, and in some cases to resell or provide professional services related to our platform."

In this regard, the Offering Documents also stated that Defendants "anticipate that we will continue to develop a select number of third-party relationships to help grow our business."

46.     Additionally, with regard to Domo's growth strategies, the Offering Documents touted that "[t]he market for [Domo's] platform is large and underpenetrated, as any organization of any size and in any industry is a potential customer of Domo," and that Defendants " believe there is substantial opportunity to add additional customers both in the United States and internationally."

47.     Notwithstanding the purported upward trajectory of Domo's billings growth and success with capturing enterprise and non-enterprise customers, the Offering Documents contained merely generic, boilerplate representations concerning the risk that the Company's growth in billings and enterprise customers could fluctuate as a result of, among other issues outside of Domo's control, seasonal sales cycles and unexpected implementation challenges with enterprise customers.  Specifically, the Offering Documents stated, in relevant part:

> ***We are increasingly targeting sales efforts at enterprise customers and the length, cost and uncertainty associated with sales cycles may result in fluctuations in our operating results and our failure to achieve the expectations of investors.***
>
> We are increasingly targeting sales efforts at enterprise customers, which we define as companies with over $1 billion in revenue, and face long sales cycles, complex customer requirements, substantial upfront sales costs, and a relatively low and difficult to predict volume of sales on a quarter-by-quarter basis . . . . Events may occur . . . that affect the size or timing of a purchase or even cause cancellations, which may lead to greater unpredictability in our business and operating results. Moreover, customers often begin to use our platform on a limited basis with no guarantee that they will expand their use of our platform widely enough across their organization to justify the costs of our sales efforts. We may also face unexpected implementation challenges with enterprise customers or more complicated installations of our platform. [. . . .]
>
> [. . . .] Our financial performance and the predictability of our quarterly financial results may be harmed by intermittent failures to secure timely or at all the higher value enterprise agreements, or changes in the volume of transactions overall, compared to our forecasts[.]

> Additionally, our quarterly sales cycles are generally more heavily weighted toward the end of the quarter with an increased volume of sales in the last few weeks and days of the quarter. This impacts the timing of recognized revenue and billings, cash collections and delivery of professional services . . . . Compression of sales activity to the end of the quarter also greatly increases the likelihood that sales cycles will extend beyond the quarter in which they are forecasted to close for some sizeable transactions, which will harm forecasting accuracy and adversely impact billings and new customer acquisition metrics for the quarter in which they are forecasted to close.

Plainly, the foregoing risk warning was a generic "catch-all" provision that was not tailored to Domo's actual known risks with respect to its billings and enterprise customer growth.

48.     The statements referenced in ¶¶ 38-47 were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) Domo was experiencing weakness in its enterprise and international businesses; (ii) Domo's billings growth had dramatically slowed; (iii) all of the foregoing was reasonably likely to have a material negative impact on the Company's financial results; and (iv) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

### Materially False and Misleading Statements Issued During the Class Period

49.     The Class Period begins on June 29, 2018, when Domo securities began publicly trading on the NASDAQ pursuant to the false or misleading statements or omissions contained in the Offering Documents.

50.     On April 15, 2019, Domo issued its first Annual Report on Form 10-K with the SEC following the IPO, reporting the Company's financial and operating results for the quarter

and year ended January 31, 2019 (the "2019 10-K").  For fiscal 2019, the Exchange Act Defendants reported a net loss of $154.31 million, or $9.43 per diluted share, on revenue of $142.46 million, compared to a net loss of $176.56 million, or $110.70 per diluted share, on revenue of $108.52 million for fiscal 2018.  For fiscal 2019, the Exchange Act Defendants also reported billings of $165.41 million, compared to billings of $129.54 million in fiscal 2018, and billings of $92.41 million in fiscal 2017.

51.     As with the Offering Documents, the 2019 10-K discussed the percentage of revenue Domo historically derived from its customers with United States addresses versus its international customers, touting the Company's increased focus on expanding its international footprint, which purportedly increased in fiscal 2019.  For example, the 2019 10-K noted that "[r]evenue from customers with billing addresses in the United States comprised 86%, 82% and 77% of [Domo's] total revenue for the years ended January 31, 2017, 2018 and 2019, respectively," and continued to assure investors that the Company was "focused on growing [its] international business and will continue to invest in sales operations outside the United States."

52.     With respect to billings in the 2019 10-K's "Key Business Metric" section, the 2019 10-K merely reiterated the statements contained in the Offering Documents quoted at ¶ 42 above.

53.     Elsewhere in the 2019 10-K, the Exchange Act Defendants highlighted Domo's "***Quarterly Billings Trends***," which, although acknowledging that "[t]he increase in billings during the three months ended January 31, 2018 and 2019 is primarily from seasonality due to the buying patterns of our larger customers and the higher concentration of customers renewing their subscriptions in our fiscal fourth quarter," nonetheless touted an overall quarterly billings trend

showing "improvement in billings . . . *due to the acquisition of additional customers and sales of larger subscription contracts to existing customers, which are attributable to [Domo's] continued focus on selling to larger enterprise customers*" (emphasis added). Thus, the 2019 10-K assured investors that Domo's business strategies were succeeding, especially as they related to the Company's larger enterprise customers, which purportedly drove the Company's acquisition of additional customers and sales. This billings trend was shown as follows (all figures in thousands):

| Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|
| April 30, 2017 | July 31, 2017 | October 31, 2017 | January 31, 2018 | April 30, 2018 | July 31, 2018 | October 31, 2018 | January 31, 2019 |
| $27,663 | $26,464 | $30,015 | $45,402 | $33,714 | $35,664 | $38,791 | $57,241 |

54.     Notwithstanding the purported upward trajectory of Domo's billings, even as recently as fiscal 2019, the 2019 10-K contained the same merely generic, boilerplate representations as the Offering Documents concerning the risk that the Company's billings and ability to capture enterprise customers could fluctuate, quoted at ¶ 47 above, which was, in whole, a plainly generic "catch-all" provision not tailored to Domo's actual known risks with respect to its billings and enterprise customer growth.

55.     With respect to revenue generally, the 2019 10-K stressed Domo's continuous growth, stating, in relevant part:

> For the years ended January 31, 2017, 2018 and 2019, we had total revenue of $74.5 million, $108.5 million and $142.5 million, respectively, representing year-over-year growth of 46% and 31% for the years ended January 31, 2018 and 2019, respectively. For the years ended January 31, 2017, 2018 and 2019, no single customer accounted for more than 10% of our total revenue, nor did any single

organization when accounting for multiple subsidiaries or divisions which may have been invoiced separately.

* * *

Subscription revenue accounted for approximately 79%, 81% and 82% of our revenue for the years ended January 31, 2017, 2018 and 2019, respectively. Subscription revenue is a function of the number of customers, the number of users at each customer, and the price per user.

56. Appended as an exhibit to the 2019 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Exchange Act Individual Defendants certified that "the [2019 10-K] fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

57. The statements referenced in ¶¶ 49-57 were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that: (i) Domo was experiencing weakness in its enterprise and international businesses; (ii) Domo's billings growth had dramatically slowed; (iii) all of the foregoing was reasonably likely to have a material negative impact on the Company's financial results; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

58. On September 5, 2019, during after-market hours, Domo issued a press release announcing its financial results for the second quarter of 2020. Although Domo reported positive earnings news, the Company also provided guidance for the third quarter and full fiscal year 2020

that fell short of market expectations.  Specifically, Defendants revealed to investors that they

expected third quarter revenue of $41.5-42.5 million versus a consensus of $44.2 million, and a

loss of $1.04-1.00 per share versus a consensus of a $0.91 loss per share.  Additionally, Defendants

revealed a full year 2020 view with revenue of $168-169 million versus a consensus of $173.7

million, and a loss of $4.10-4.00 per share versus a consensus of a $3.82 loss per share.

59.     Then, on September 6, 2019, during pre-market hours, JMP dropped its Domo

target by $10.00 to $37.00, citing the "disappointing" report and guidance, weakness in Domo's

enterprise and international businesses, and billings growth that was about half of what was

expected.

60.     On this news, Domo's stock price fell $9.44 per share, or 37.45%, to close at $15.77

per share on September 6, 2019, or 24.9% below the IPO price of $21.00.

61.      As of the time this complaint was filed, the price of Domo common stock continues

to trade below the IPO price.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

62.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than

Defendants that purchased or otherwise acquired: (a) Domo common stock in the IPO or purchased

Domo common stock thereafter in the stock market pursuant and/or traceable to the Company's

Offering Documents issued in connection with the IPO; or (b) Domo securities during the Class

Period; and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the

officers and directors of the Company, at all relevant times, members of their immediate families

and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants

have or had a controlling interest.

63.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Domo securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Domo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

64.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

65.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

66.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of Domo;

- whether the Securities Act Individual Defendants negligently prepared the Offering Documents for the IPO and, as a result, the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- whether the Exchange Act Individual Defendants caused Domo to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Domo securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

67.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

68.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Domo  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Domo securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

69.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

70.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 11 of the Securities Act Against All Defendants)**

71.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

72.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Defendants.

73.     The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

74.     Domo is the registrant for the IPO.  Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

75.     As issuer of the shares, Domo is strictly liable to Plaintiff and the Class for the misstatements and omissions in the Offering Documents.

76.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

77.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

78.     Plaintiff acquired Domo shares pursuant and/or traceable to the Offering Documents for the IPO.

79.     Plaintiff and the Class have sustained damages.  The value of Domo securities has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### (Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)

80.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

81.     This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act.

82.     The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Domo within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and influence and exercised the same to cause Domo to engage in the acts described herein.

83.     The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

84.     By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)**

85.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

86.     This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87.     During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Domo securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Domo securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

88.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed

to influence the market for Domo securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Domo's finances and business prospects.

89.     By virtue of their positions at Domo, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.  Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

90.     Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.  As the senior managers and/or directors of Domo, the Exchange Act Individual Defendants had knowledge of the details of Domo's internal affairs.

91.     The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Domo.  As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Domo's businesses, operations, future financial condition and future prospects.  As a

result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Domo securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Domo's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Domo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

92.     During the Class Period, Domo securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Domo securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Domo securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Domo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

93.     By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

94.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

**(Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)**

95.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Domo, and conducted and participated, directly and indirectly, in the conduct of Domo's business affairs.  Because of their senior positions, they knew the adverse non-public information about Domo's misstatement of income and expenses and false financial statements.

97.     As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Domo's financial condition and results of operations, and to correct promptly any public statements issued by Domo which had become materially false or misleading.

98.     Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Domo disseminated in the marketplace during the Class Period concerning Domo's results of operations.  Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Domo to engage in the

wrongful acts complained of herein.  The Exchange Act Individual Defendants therefore, were "controlling persons" of Domo within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Domo securities.

99.     Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Domo.  By reason of their senior management positions and/or being directors of Domo, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Domo to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Individual Defendants exercised control over the general operations of Domo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

100.    By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Domo.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.


Dated:  October 17, 2019                    Respectfully submitted,


**PETERS | SCOFIELD**

*/s/ David W. Scofield*
David W. Scofield


**POMERANTZ LLP**
Jeremy A. Lieberman (Pro Hac Vice Forthcoming)
J. Alexander Hood II (Pro Hac Vice Forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom (Pro Hac Vice Forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein (Pro Hac Vice Forthcoming)
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com


*Attorneys for Plaintiff*