| | | |
|---|---|---|
| David W. Scofield - 4140<br>**PETERS \| SCOFIELD**<br>*A Professional Corporation*<br>7430 Creek Road, Suite 303<br>Sandy, Utah 84093-6160<br>Telephone: (801) 322-2002 Ext. 102<br>Direct Dial: (801) 858-3402<br>Toll Free: (888) 296-3998<br>Facsimile: (801) 912-0320<br>Email: dws@psplawyers.com | **POMERANTZ LLP**<br>Jeremy A. Lieberman<br>Tamar A. Weinrib<br>600 Third Avenue, 20th Floor<br>New York, New York 10016<br>Telephone: (212) 661-1100<br>Facsimile: (917) 463-1044<br>Email: jalieberman@pomlaw.com<br>Email: taweinrib@pomlaw.com | **POMERANTZ LLP**<br>Patrick V. Dahlstrom<br>10 South La Salle Street, Suite 3505<br>Chicago, Illinois 60603<br>Telephone: (312) 377-1181<br>Facsimile: (312) 377-1184<br>Email: pdahlstrom@pomlaw.com |

*Attorneys for Plaintiffs*


**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

| | |
|---|---|
| EXKAE Ltd., Lead Plaintiff, and MARISA ELLIS, JOHN MARBACH, JARRETT PATTON, and LISA DAVIS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DOMO, INC., JOSHUA G. JAMES, BRUCE FELT, FRASER BULLOCK, MATTHEW R. COHLER, DANA EVAN, MARK GORENBERG, NEHAL RAJ, and GLENN SOLOMON,<br><br>Defendants. | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No. 2:19-cv-00781-DAK-DAO<br><br>Hon. Judge Dale A. Kimball |

## INTRODUCTION

Lead Plaintiff EXKAE Ltd. and Plaintiffs Marisa Ellis, John Marbach, and Lisa Davis (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief

as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Domo, Inc. ("Domo" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Domo common stock pursuant and/or traceable to the Company's initial public offering ("IPO" or "Offering") commenced on or around June 29, 2018; or (b) Domo securities between June 28, 2018 and September 5, 2019, both dates inclusive (the "Class Period"). Plaintiffs pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2. Domo was founded in 2010 and is headquartered in American Fork, Utah. The Company was formerly known as Domo Technologies, Inc. and changed its name to Domo, Inc. in December 2011. The Company operates a cloud-based platform in the United States that purportedly digitally connects everyone from the chief executive officer to the frontline employee with the people, data, and systems in an organization, giving them access to real-time data and insights, and allowing them to manage business from smartphones. Domo's software is focused on providing any employee with a real-time view of key business operations and providing access to data analysis, with a focus on mobile enablement. In other words, the whole purpose of Domo's

business is to provide employees from c-suite executives to low level employees with up to date access to information. ***Domo used its own service internally***.

3. On June 1, 2018, Domo filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after amendment, was declared effective by the SEC on June 28, 2018 (the "Registration Statement"). On June 29, 2018, Domo filed a prospectus in connection with the IPO on Form 424B4 (the "Prospectus"), which incorporated and formed part of the Registration Statement (collectively, the "Offering Documents").

4. On or around June 29, 2018, pursuant to the IPO, Domo's Class B common stock began trading on the Nasdaq Global Market ("NASDAQ"). On July 3, 2018, Domo closed the IPO, in which the Company issued and sold 10,580,000 shares of Class B common stock at $21.00 per share for aggregate net proceeds of $202.5 million, after deducting underwriters' discounts and offering expenses payable by the Company.

5. Defendants explained in the Offering Documents that in the two years leading up to the IPO, enterprise customers, defined as companies with more than $1 billion in revenue, constituted a material portion--- almost 50%-- of Domo's revenue. The Offering Documents explicitly conveyed that the Company focused its efforts on enterprise client acquisition and "growing our international business." Defendants also made clear that, "[f]rom the beginning, we targeted CEOs as a key user of our platform. That concept has fundamentally influenced every aspect of the Domo platform from architecture to user experience."

6. Defendants explained that Domo's "ability to expand our customer base is an important indicator of market penetration, the growth of our business, and future business opportunities." To that end, they identified Domo's Key Business Metric as billings, which reflect, *inter alia,* sales to new customers.

7. The Exchange Act Defendants[1] repeated representations regarding the strength of its enterprise customer acquisition efforts, the growth of its international business, and Domo's rate of billings growth in SEC filings throughout the Class Period.

8. However, Domo struggled to develop and maintain a consistent go to market ("GTM") strategy. Specifically, *inter alia*, Domo had significant difficulty acquiring new enterprise customers because its platform could not integrate with other data sharing services, Domo targeted too many business segments rather than taking a specialized and more targeted approach, Domo did not have a consistent sales message and defined identity, and Domo targeted its sales pitch at c-suite executives rather than data analysts when pitching potential customers. Unbeknownst to the market, Defendants overfocus on enterprise customer acquisition, despite these hurdles, as well as its ineffective efforts to grow internationally impacted in part by the overfocus on the enterprise business, negatively impacted billings and raised the risk that Domo could not sustain an accelerated (or even steady) rate of billings growth.

9. The Offering Documents were thus negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, the Offering Documents, and statements Defendants made throughout the Class Period, were false and/or misleading statements and/or failed to disclose that: (i) Domo was experiencing weakness in its enterprise and international businesses; (ii) Domo's billings growth had dramatically slowed; (iii) all of the foregoing was reasonably likely to have a material negative

[1] Defined below.

impact on the Company's financial results; and (iv) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein and the Company's public statements were materially false and misleading at all relevant times.

10. On September 5, 2019, after-market hours, Domo issued a press release announcing its financial results for the second quarter of 2020, with guidance for the third quarter and full fiscal year 2020 that fell short of market expectations. Though touting billings growth throughout the Class Period, the Company revealed in the earnings release that Domo had been suffering a deceleration in billings growth. Specifically, Domo reported billings growth of 9% year over year to $39 million versus the 17%, or $42 million in growth that had been expected. Moreover, management guided FY20 billings down to $172 million from $198 million prior. The press release revealed that Domo now expected third quarter revenue of $41.5-42.5 million versus a consensus of $44.2 million, and a loss of $1.04-1.00 per share versus a consensus of a $0.91 loss per share. Additionally, Domo disclosed a full year 2020 view with revenue of $168-169 million versus a consensus of $173.7 million, and a loss of $4.10-4.00 per share versus a consensus of a $3.82 loss per share. On an earnings call the same day, Defendants elaborated upon the weakness in its enterprise and international business as well as the deceleration in billings growth.

11. Then, on September 6, 2019, during pre-market hours, JMP Securities ("JMP") dropped its Domo target by $10.00 to $37.00, citing the "disappointing" report and guidance, weakness in Domo's enterprise and international businesses, and billings growth that was about half of what was expected. Many other analysts followed suit, slashing their price targets based on Domo's revelations regarding the weaknesses in its enterprise and international business as well as the deceleration in the rate of its billings growth.

12. On this news, Domo's stock price fell $9.44 per share, or 37.45%, to close at $15.77 per share on September 6, 2019, or 24.9% below the IPO price of $21.00.

13. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Domo's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16. Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Domo is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

17. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

18. Plaintiffs, as set forth in the attached or previously filed certifications, purchased Domo securities pursuant and/or traceable to the Offering Documents issued in connection with the Company's IPO, and/or purchased or otherwise acquired Domo securities at artificially inflated prices during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19. Defendant Domo is a Delaware corporation with principal executive offices located at 772 East Utah Valley Drive, American Fork, UT 84003. Domo's common stock trades on the NASDAQ under the ticker symbol "DOMO."

20. Defendant Joshua G. James ("James") served as Domo's Founder, Chief Executive Officer, and a Director at all relevant times. James signed or authorized the signing of the Offering Documents filed with the SEC. As explained in the Company's SEC filings, at all relevant times, Defendant James had voting control over all matters submitted to Domo's stockholders for approval. Specifically, e.g., Domo's annual 10-K filed on April 15, 2019 explained that:

> Our Class A common stock has 40 votes per share, and our Class B common stock has one vote per share. Cocolalla, LLC holds all of the shares of the Class A common stock, and our founder and chief executive officer Joshua G. James, who is the managing member of Cocolalla, LLC, controls approximately 85% of the voting power of our outstanding capital stock and therefore is able to control all matters submitted to our stockholders for approval.

21. Defendant Bruce Felt ("Felt") served as Domo's Chief Financial Officer at all relevant times. Felt signed or authorized the signing of the Offering Documents filed with the SEC.

22. Defendants James and Felt are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

23. The Exchange Act Individual Defendants possessed the power and authority to control the contents of Domo's SEC filings, press releases, and other market communications. The Exchange Act Individual Defendants were provided with copies of Domo's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Domo, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

24. Domo and the Exchange Act Individual Defendants are sometimes referred to herein collectively as the "Exchange Act Defendants."

25. Defendant Fraser Bullock ("Bullock") served as a Director of Domo at all relevant times. Bullock signed or authorized the signing of the Offering Documents filed with the SEC.

26. Defendant Matthew R. Cohler ("Cohler") served as a Director of Domo at all relevant times. Cohler signed or authorized the signing of the Offering Documents filed with the SEC.

27. Defendant Dana Evan ("Evan") served as a Director of Domo at all relevant times. Evan signed or authorized the signing of the Offering Documents filed with the SEC.

28. Defendant Mark Gorenberg ("Gorenberg") served as a Director of Domo at all relevant times. Gorenberg signed or authorized the signing of the Offering Documents filed with the SEC.

29. Defendant Nehal Raj ("Raj") served as a Director of Domo at all relevant times. Raj signed or authorized the signing of the Offering Documents filed with the SEC.

30. Defendant Glenn Solomon ("Solomon") served as a Director of Domo at all relevant times. Solomon signed or authorized the signing of the Offering Documents filed with the SEC.

31. Defendants James, Felt, Bullock, Cohler, Evan, Gorenberg, Raj, and Solomon are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

32. As directors, executive officers and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Domo stock in the IPO for their own benefit and the benefit of Domo. The Securities Act Individual Defendants were key members of the IPO working group and executives of Domo who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

33. The Exchange Act Defendants and the Securities Act Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

34. Domo was founded in 2010 and is headquartered in American Fork, Utah. The Company was formerly known as Domo Technologies, Inc. and changed its name to Domo, Inc. in December 2011. The Company operates a cloud-based platform in the United States that purportedly digitally connects everyone from the chief executive officer to the frontline employee with the people, data, and systems in an organization, giving them access to real-time data and insights, and allowing them to manage business from smartphones. As Defendants explained in the Offering Documents:

> Our platform enables every type of employee to connect to, analyze, and leverage data from their smartphone. As a result, data-driven knowledge proliferates throughout an organization as more employees become capable of contributing to shared, collaborative analysis. When freed from the constraints of traditional business intelligence tools, these employees tend to not only become increasingly productive, but also feel more connected to the broader organization.

35. In fact, Domo uses its own platform internally, providing each of the Defendants, and the rest of Domo's employees with real time access to the Company's data.

36. On June 1, 2018, Domo filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after amendment, was declared effective by the SEC on June 28, 2018. On June 29, 2018, Domo filed a prospectus in connection with the IPO on Form 424B4, which incorporated and formed part of the Registration Statement.

37. On or around June 29, 2018, pursuant to the IPO, Domo's Class B common stock began trading on the NASDAQ. On July 3, 2018, Domo closed the IPO, in which the Company issued and sold 10,580,000 shares of Class B common stock at $21.00 per share for aggregate net proceeds of $202.5 million, after deducting underwriters' discounts and offering expenses payable by the Company.

38. In the Offering Documents, and in SEC filings throughout the Class Period thereafter, Defendants touted the Company's billings growth, its focus on and success with enterprise customers, and the substantial opportunity for continued strength in its international business.

39. However, multiple former employees confirm that in the years leading up to the IPO and throughout the Class Period, Defendants knew that Domo did not employ an effective sales effort and thus struggled to acquire potential enterprise customers. That struggle negatively impacted the Company's ability to grow billings at the lofty pace Defendants' touted throughout the Class Period. Moreover, though highlighting the strength and opportunity for Domo's

international business, as well as the significance of that business to the Company's overall success, the Company in fact struggled to grow its international business and did not spend its international marketing effectively.

40. Confidential Witness ("CW") 1, Chief Operating Officers/Chief Analytics Officer, Chief of Staff, Senior Vice President of Consulting, General Manager- Appstore and Chief Strategic Solutions Officer from February 2014 to May 2018, served as Defendant James' "right-hand man." In that role, CW1 had responsibility for execution and leadership across all facets of Domo's business. CW1 confirmed that Domo struggled to acquire new enterprise customers and stated that to mask struggles in growing enterprise revenue, Defendants began "finagling with what enterprise meant." Specifically, Defendants started classifying international revenue as enterprise revenue even if the international companies did not qualify as enterprise companies with at least $1 billion in revenue. To further mask its struggles, CW1 explained that Domo booked revenue from multi-year Enterprise License Agreements for a specific number of licenses. But according to CW1, the utilization of the licensees was fractional, meaning Domo was "mortgaging the future" to book up-front revenue. CW1 stated that despite the up-front revenue, usage of Domo's platform "wasn't going up."

41. CW1 explained that the reason for this was that Domo's sales efforts were unfocused, with Domo targeting "120 different segments," an approach CW1 described as "a mile wide and an inch deep." CW1 explained that, "the whole point of a go-to-market strategy is to pick an ideal segment and go after it," but Domo's approach was the exact opposite, contradicting "marketing 101." CW1 stated that despite ***telling Defendant James*** that this approach "is lunacy," and that "we can't be everything to everybody because we're losing to people who are focused on these specialized markets," Defendant James refused to switch gears. CW1 also tried to convince

James to "open up its platform" so that Domo could integrate into, or work on top of, companies' existing data warehouses, rather than taking an all or nothing approach.

42. CW1 further explained that Domo's Customer Acquisition Cost ("CAC") was so high that it took the company between 40 and 72 months to break even on contracts, while industry best practice is less than 12 months. CW1 stated that Domo's cost of acquisition was "hundreds of thousands of dollars," adding, "we were just getting our clocks cleaned."

43. According to multiple former employees, Domo's struggles in acquiring new enterprise customers also stemmed from its misdirected marketing pitch. For example, CW2, an analytics consultant and manager of analytics/business operations from January 2016 to October 2018 at Domo[2], stated that CW2 and many of CW2's colleagues ***repeatedly told Defendant James during meetings*** that Domo should not focus its sales pitch at the c-suite (*i.e.*., the senior executives of a company) but rather at the data analysts actually involved in the "business intelligence" of the companies. Moreover, CW2 stated that Domo always focused its sales effort on enterprise customers but kept running into "roadblocks" because of enterprise companies' concerns over data security, inability to get approval from chiefs of data, analytics and technology, and the fact that many such companies had already invested in a business intelligence tool.

44. CW3, a senior consultant and principal consultant at Domo from April 2015 to January 2019, also confirmed that Domo misdirected its enterprise customer pitch to the c-suite rather than targeting companies' data analysts. CW3 worked primarily with enterprise customers to implement Domo's services. CW3 stated that Domo did not meet its enterprise sales goals during CW3's time at the Company and its inability to bring in the business it forecasted became a common topic of discussion. Nevertheless, CW3 said that Domo never adjusted its sales efforts

[2] In that role, CW2 supported Domo's sales team, developed metrics and analysis for Domo's client success team and created metrics to track usage of the free domo platform.

to reach more analysts despite the concerns voiced regarding overemphasis in targeting c-suite executives.

45. Domo's impediments to generating new enterprise business were well known to Defendants at all relevant times. Indeed, CW2 and CW3 explained that ***Domo used its own platform internally*** to provide ***all employees*** with up to date access to information and updates. CW3 confirmed that Defendants James and Felt as well as Domo's other senior executives had access to all information on the platform, which was constantly updated, including acquisition of new enterprise customers.

46. CW4, an account development manager and enterprise account development manager from 2015 to February 2019, stated that at least beginning in 2017 and throughout the rest of CW4's employment at Domo, the Company experienced a slowdown in the number of new enterprise customers. CW4 made clear that Defendants focused on landing enterprise customers but "weren't hitting the numbers they were wanting to hit." Another roadblock CW4 identified in Domo's ability to acquire new enterprise customers was the limit on the amount of data Domo's products could handle or process at one time. CW4 explained that half of Domo's sales team was dedicated to enterprise customers with the other half split between mid-market and senior mid-market customers. CW4 stated that members of Domo's sales team voiced concerns that Domo spent too much of its marketing budget on enterprise customers.

47. CW6, a staff accountant at Domo from August 2017 to August 2019 that managed accounts of 25 enterprise customers, stated that Domo also struggled to pitch its platform to enterprise clients because it kept changing the way it described the platform to potential customers, from "Excel on steroids" to "a platform that encompasses everything." CW6 explained that Defendant James's constant shifting of the sales pitch evidenced his understanding that the

Company's unclear sales message hurt its capability to land deals with new enterprise customers. CW6 described Domo as a company without an identity, which impacted its ability to acquire new enterprise customers. ***CW6 confirmed Defendant James' awareness of Domo's acquisition efforts toward enterprise customers and stated that James even joined sales staff on visits to potential customers***. CW6 stated that Domo's struggles to attract new enterprise customers became apparent at least by late 2018.

48. CW9, Vice President, Field, Partner and Experiential Marketing at Domo from December 2017 until September 2018, confirmed that Domo did not have a clear marketing message or value proposition. According to CW9, Defendant James knew that Domo's marketing message was flawed and that this had an impact on the Company's ability to attract enterprise clients.

49. Not only did Defendants keep changing the sales pitch, but also kept changing the definition of an "enterprise client" further complicating the acquisition effort. CW7, an inbound account development manager from August 2016 to October 2018, tasked with generating enterprise customer leads, stated that Defendant James held meetings with CW7's team and so often changed the requirement for what constituted an "enterprise client" that it complicated the sales effort.

50. CW10, a Corporate Account Development Manager from August 2018 to October 2019, stated that Domo shared its growth plans with employees at all-hands meetings but consistently missed its goals for multiple quarters during CW10's time at the Company. CW10 specified that it became clear over the several months after joining Domo that the Company would not be able to expand its customer base sufficiently to meet its revenue and growth goals over the upcoming quarters. According to CW10, the enterprise focused sales team consistently could not

meet the Company's goals. Knowing this, Defendants made constant strategy shifts and personnel changes to try and "hit its lofty numbers."

51. CW11, President of Domo from September 2012 to October 2018, explained that, contrary to the Company's Offering Documents, the market for Domo's platform was "incredibly crowded," not "large and underpenetrated." CW11 reported directly to Defendant James. According to CW11, each time Domo tried to pitch a deal, a customer had at least six to nine other solutions that looked exactly like what Domo offered. Confirming other CWs statements regarding shifting sales pitches and changing personnel, CW11 explained that efforts to acquire enterprise customers had to be "restarted a few different times" in part because "we continued to turn over our chief marketing officers."

52. Defendants similarly "oversold" Domo's ability to grow internationally though knowing its marketing efforts internationally were falling short. CW12, a Senior Manager, Marketing Operations and Analytics and Senior Manager, Integrated Campaigns and Account-Based Marketing from October 2011 to April 2018, confirmed that Domo did not utilize its marketing budget well in trying to grow its international business. CW12 had direct involvement with the international marketing analytics. According to CW6, Domo's international business plateaued no later than 2019 in part because of internal conflict that led to firings and explained that Domo's international business made up about 10 percent of the company's total revenue.

53. The Company's difficulties in generating new enterprise business, and to grow its international business, impacted its ability to maintain its rate of billings growth. CW8, a Strategic Executive Consultant from September 2013 to May 2019, confirmed that Domo always struggled to land enterprise customers and stated that Defendant James "kept really close tabs" on acquisition of new enterprise customers and billings growth.

54. According to CW4, Defendants kept track of billings using the Domo platform. CW5, Vice President, Investor Relations and Treasurer from June 2015 to May 2018, stated that Domo also tracked billings using Netsuite, which employees with permission could access whenever they wanted. CW6 confirmed that Defendants James and Felt had access to Netsuite.

**Materially False and Misleading Statements Issued in the Offering Documents**

55. The Offering Documents contained materially false and misleading statements regarding Domo's enterprise business and billings growth in violation of Section 11 of the Securities Act's disclosure obligations.

56. For Domo's fiscal year ended January 31, 2018, the Offering Documents noted that Domo's total number of customers increased from 1,199 in fiscal 2017 to 1,521 in fiscal 2018, and that billings had increased from $92.41 million in fiscal 2017 to $129.54 million in fiscal 2018.

57. The Offering Documents also highlighted the Company's "***Proven Enterprise Readiness***"[3] as one of Domo's competitive strengths. In support of this, the Offering Documents asserted that Domo "ha[d] invested significantly to broaden [its] platform capabilities and enhance security and scalability requirements for the enterprise." In this regard, the Offering Documents also asserted that Domo's "enterprise customer base has grown from 36 as of January 31, 2014, to 385 as of April 30, 2018, representing a compound annual growth rate, or CAGR, of 75%," that the Company's "customer base includes 36% of the 2017 Fortune 50 as of the date of this prospectus," and that the Company was "investing in [its] field sales team to further increase [its] focus on attracting new enterprise customers and expanding [its] footprint within [its] current enterprise customers."

[3] All emphases are as they appear in the original statements unless indicated otherwise.

58. Additionally, in discussing Domo's key business metrics, the Offering Documents touted the quality, number, and growth of Domo's customer base, stating, in relevant part:

> We believe that our ability to expand our customer base is an important indicator of market penetration, the growth of our business, and future business opportunities. We define a customer at the end of any particular quarter as an entity that generated revenue greater than $2,500 during that quarter . . . . In addition to our increase in total customers, as of April 30, 2018, we had 385 enterprise customers, representing a compound annual growth rate of 75% from January 31, 2014. For the years ended January 31, 2017 and 2018 and the three months ended April 30, 2017 and 2018, no single customer accounted for more than 10% of our total revenue, nor did any single organization when accounting for multiple subsidiaries or divisions which may have been invoiced separately.

59. In discussing Domo's billings as a key business metric, the Offering Documents stated that "[b]illings represent [the Company's] total revenue plus the change in deferred revenue in a period," and that "[b]illings reflect sales to new customers plus subscription renewals and upsells to existing customers, and represent amounts invoiced for subscription, support and professional services." In this respect, the Offering Documents stated that the Company "typically invoice[s] customers in advance in annual installments for subscriptions to [its] platform," and generally warned that "[b]ecause [the Company] generate[s] most of [its] revenue from customers who are invoiced on an annual basis and have a wide range of annual contract values, [the Company] may experience variability due to typical enterprise buying patterns and timing of large renewals." This warning was plainly a general "catch-all" provision that was not tailored to Domo's actual known risks with respect to slowed billings growth.

60. Additionally, the Offering Documents touted the purported strength of Domo's enterprise business's revenue and subscription retention rates. For example, the Offering Documents stated, in relevant part:

> As of April 30, 2018, we had more than 1,500 organizations as customers, including 385 customers with more than $1 billion in revenue, which we refer to as enterprise customers. For the fiscal years ended January 31, 2017 and 2018 and the three

> months ended April 30, 2017 and 2018, our enterprise customers accounted for 47%, 46%, 46% and 46% of our revenue for such periods, respectively. We employ a land-and-expand business model and typically enter into enterprises within a specific division or for a specific use case. As our users see the value of our platform, we expand our footprint within the enterprise . . . . As of January 31, 2018, for the cohort of enterprise customers that licensed our product in the fiscal year ended January 31, 2015, the current annual contract value, or ACV, was 186% of the original license value, compared to 129% and 160% for the cohorts of enterprise customers that subscribed to our platform in the fiscal years ended January 31, 2016 and 2017, respectively . . . .

61. Defendants also made clear that in focusing sales efforts toward acquiring new enterprise customers, "[f]rom the beginning, we targeted CEOs as a key user of our platform. That concept has fundamentally influenced every aspect of the Domo platform from architecture to user experience."

62. Additionally, the Offering Documents discussed the percentage of revenue Domo historically derived from its customers with United States addresses versus its international customers, ***touting the Company's increased focus on expanding its international footprint***. For example, the Offering Documents noted that "[i]n the fiscal years ended January 31, 2017 and 2018 and the three months ended April 30, 2017 and 2018, [Domo] derived 86%, 82%, 83% and 79%, respectively, of [its] revenue from customers with billing addresses in the United States; however, [Defendants] are focused on growing [Domo's] international business and will continue to invest in sales operations outside the United States."

63. Emphasizing expected growth internationally, the Offering Documents stated that Defendants "believe we are extremely well-poised to capitalize on global digital transformation, creating more competitive organizations built on data-centric, connected and collaborative workforces," and that Defendants "ha[d] assembled an experienced management team to execute on this global opportunity."

64. The Offering Documents also touted Domo's international go-to market partnerships, which purportedly aided in driving the Company's growth. For example, the Offering Documents stated that Defendants "have . . . developed go-to-market partnerships with a number of key technology, system integrator and consultant partners . . . internationally to help customers and potential customers validate our solutions and provide introductions to potential customers, and in some cases to resell or provide professional services related to our platform." In this regard, the Offering Documents also stated that Defendants "anticipate that we will continue to develop a select number of third-party relationships to help grow our business."

65. Additionally, with regard to Domo's growth strategies, the Offering Documents touted that "[t]he market for [Domo's] platform is large and underpenetrated, as any organization of any size and in any industry is a potential customer of Domo," and touted the "substantial opportunity to add additional customers both in the United States and internationally."

66. Notwithstanding the purported upward trajectory of Domo's billings growth and success with capturing enterprise and non-enterprise customers, the Offering Documents contained generic, boilerplate representations concerning the risk that the Company's growth in billings, acquiring enterprise customers, and expanding internationally could fluctuate as a result of, among other issues outside of Domo's control, seasonal sales cycles and unexpected implementation challenges with enterprise customers. For example, the Offering Documents stated:

> ***We are increasingly targeting sales efforts at enterprise customers and the length, cost and uncertainty associated with sales cycles may result in fluctuations in our operating results and our failure to achieve the expectations of investors.***
>
> We are increasingly targeting sales efforts at enterprise customers, which we define as companies with over $1 billion in revenue, and face long sales cycles, complex customer requirements, substantial upfront sales costs, and a relatively low and difficult to predict volume of sales on a quarter-by-quarter basis . . . . Events may

> occur . . . that affect the size or timing of a purchase or even cause cancellations, which may lead to greater unpredictability in our business and operating results. Moreover, customers often begin to use our platform on a limited basis with no guarantee that they will expand their use of our platform widely enough across their organization to justify the costs of our sales efforts. We may also face unexpected implementation challenges with enterprise customers or more complicated installations of our platform. [. . . .]
>
> [. . . .] Our financial performance and the predictability of our quarterly financial results may be harmed by intermittent failures to secure timely or at all the higher value enterprise agreements, or changes in the volume of transactions overall, compared to our forecasts[.]
>
> Additionally, our quarterly sales cycles are generally more heavily weighted toward the end of the quarter with an increased volume of sales in the last few weeks and days of the quarter. This impacts the timing of recognized revenue and billings, cash collections and delivery of professional services . . . . Compression of sales activity to the end of the quarter also greatly increases the likelihood that sales cycles will extend beyond the quarter in which they are forecasted to close for some sizeable transactions, which will harm forecasting accuracy and adversely impact billings and new customer acquisition metrics for the quarter in which they are forecasted to close.

The foregoing generic risk warning did nothing to alert investors to Domo's actual known risks with respect to its billings and enterprise customer growth.

67. The statements referenced in ¶¶ 55-66 were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. These included statements regarding Domo's billings growth, international growth, and enterprise business. Specifically, contrary to the foregoing statements in the Offering Documents, Domo struggled to develop and maintain a consistent go to market ("GTM") strategy. *Inter alia*, Domo had significant difficulty acquiring new enterprise customers because its platform could not integrate with other data sharing services, Domo targeted too many business segments rather than taking a specialized and more targeted approach, Domo did not have a consistent sales

message and defined identity, and Domo targeted its sales pitch at c-suite executives rather than data analysts when pitching potential customers. Unbeknownst to the market, Defendants overfocus on enterprise customer acquisition, despite these hurdles, as well as its ineffective efforts to grow internationally, negatively impacted billings and raised the risk that Domo could not sustain an accelerated (or even steady) rate of billings growth.

68. Simply put, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) Domo was experiencing weakness in its enterprise and international businesses; (ii) Domo's billings growth had dramatically slowed; (iii) all of the foregoing was reasonably likely to have a material negative impact on the Company's financial results; and (iv) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

**Materially False and Misleading Statements Issued During the Class Period**

69. The Class Period begins on June 29, 2018, when Domo securities began publicly trading on the NASDAQ pursuant to the false or misleading statements or omissions contained in the Offering Documents.

70. Thereafter, on September 5, 2018, Domo issued an earnings release for the second quarter of fiscal 2019, ended July 31, 2018. Therein, the Exchange Act Defendants reported 35% year-over-year growth in total billing. Moreover, Defendant James stated that, "The IPO has given us the capital needed to successfully execute our business plan."

71. The foregoing statements were false and misleading because the Exchange Act Defendants failed to disclose that: 1) Defendants' flawed business plan and unclear sales strategy hampered Domo's ability to acquire new enterprise customers; and 2) Domo's difficulties in

acquiring enterprise customers negatively impacted the Company's ability to accelerate (or at minimum maintain) billings growth.

72. On September 7, 2018, Domo held an earnings to call to discuss the second quarter results. On the call Defendant Felt touted Domo's "accelerating billings" growth, stating that, "[b]illings grew 35% driven by 47% improvement in sales force productivity compared to last quarter." Defendant James similarly stated, "this quarter we saw a 35% year-over-year increase in billings compared to 22% year-over-year last quarter and year-over-year revenue growth of 32% with notable growth in our international business." Further lauding Domo's international business, Defendant James stated, that the international business is "growing very rapidly," that "everything looks great in terms of the customer bases," and that they'd done "an excellent job at building their business…we can count on continued high growth from them." Defendant Felt added that, "because of our focus and investment in our international operations, we saw an 83% growth in our international business, representing 23% of our Q2 revenue."

73. Regarding Domo's enterprise business, Defendant James emphasized Domo's "strong performance in…enterprise" and "strong enterprise referrals," and representing that they are seeing the "enterprise business grow." Defendant James further stated that, "we've had that success with the big enterprise customers…" and "we have the right strategies with these enterprise customers…" Defendant Felt stated, "we're seeing just the beginning of all the effort that we've put into enterprise sales, enterprise sales management and marketing and marketing focus."

74. The foregoing statements were false and misleading because, 1) Domo experienced weakness in its enterprise and international businesses; 2) as a result, Domo faced an increased risk to its billings growth; 3) this created a high likelihood of material negative impact to the Company's financial results. Specifically, the Exchange Act Defendants failed to reveal

that Domo struggled to develop and maintain a consistent go to market ("GTM") strategy. *Inter alia*, Domo had significant difficulty acquiring new enterprise customers because its platform could not integrate with other data sharing services, Domo targeted too many business segments rather than taking a specialized and more targeted approach, Domo did not have a consistent sales message and defined identity, and Domo targeted its sales pitch at c-suite executives rather than data analysts when pitching potential customers. Unbeknownst to the market, Defendants overfocus on enterprise customer acquisition, despite these hurdles, as well as its ineffective efforts to grow internationally, negatively impacted billings and raised the risk that Domo could not sustain an accelerated (or even steady) rate of billings growth in upcoming quarters.

75. On September 13, 2018, Domo filed its first quarterly report on Form 10-Q for the second quarter ended July 31, 2018 ("2Q 2019 10-Q"), signed by Defendant Felt, and accompanied by SOX certifications signed by Defendants James and Felt. In their SOX certifications, Defendants represented that, " this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report…" The Exchange Act Defendants further stated that they, "Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities***, particularly during the period in which this report is being prepared."

76. In the 2Q 2019 10-Q, Defendants represented that "to encourage wider and more strategic adoptions," the Company was "shifting our sales and marketing activities towards

enterprise customers." Regarding Domo's enterprise business, the Exchange Act Defendants further stated:

> We also intend to shift marketing spending from broad based initiatives that are better suited to attracting smaller organizations towards enterprise-targeted marketing campaigns and user events that we believe will result in larger initial new customer ACV and more upsell ACV potential.
>
> ***
>
> Historically, we have made significant investments in research and development to build our platform and to offer enterprise customers the features and functionality that they require.
>
> ***
>
> We are increasingly targeting sales efforts at enterprise customers.

77. The 2Q 2019 10-Q contained the same ineffective boilerplate warnings as Domo's previous filings, which did nothing to alert investors to current and specific risks to Domo's enterprise business.

78. Regarding its international business, Defendants stated:

> Revenue from customers with billing addresses in the United States comprised 83% and 77% or our total revenue for the three months ended July 31, 2017 and 2018, respectively, and 83% and 78% of our total revenue for the six months ended July 31, 2017 and 2018, respectively; however, we are focused on growing our international business and will continue to invest in sales operations outside the United States.
>
> ***
>
> ***Our long-term growth depends in part on being able to expand internationally on a profitable basis.***
>
> ***
>
> We expect to use the net proceeds from our initial public offering for working capital and other general corporate purposes, which we currently expect will include continued investment in developing technology to support our growth, increased investment in our sales team and marketing activities, as well as overall growth in our international operations.

79. As in Domo's Offering Documents, the Exchange Act Defendants continued to identify billings as a "key business metric" in the 2Q 2019 10-Q.

80. The foregoing statements in the 2Q 2019 10-Q were false and misleading for the reasons stated in ¶ 74 herein.

81. On December 6, 2018, the Exchange Act Defendants filed an earnings release attached to Form 8-K with the SEC, signed by Defendant Felt, announcing the Company's third quarter results for fiscal 2019. Therein the Exchange Act Defendants stated that billings were $38.8 million or 29% year over year growth. Defendant James stated that, "[d]emand for our products and services continues to grow as ***enterprises*** around the globe embrace digital transformation and ***push our products deeper into their business processes***. We have a very large multi-billion-dollar market opportunity in front of us."

82. The same day, the Exchange Act Defendants held an earnings call, during which Defendant James once again touted Domo's billings growth, enterprise business, and international business, stating:

> This quarter, we saw a 29% year-over-year increase in billings and year-over-year revenue growth of 30%, led by 34% growth in subscription revenue.
>
> ***
>
> As the strong billings growth implies, our Q3 sales performance was also healthy across the board, ***with particularly strong performance in our U.S. enterprise business*** and in EMEA.

83. On the call, Defendant Felt also spoke about Domo's current and expected billings growth, stating:

> We had another strong quarter, billings grew 29% to $38.8 million. We're particularly pleased with the results of North America enterprise as that has been the key area of focus for improvement.
>
> ***
>
> We are planning for more improvement in Q4 and with a seasonally strong Q4 quarter, we are planning for a 30% sequential increase in billings from Q3 to Q4.

84. The foregoing statements in the earnings release and on the related earnings call were false and misleading for the reasons stated in ¶ 74 herein.

85. On December 13, 2018, Domo filed its quarterly report for the third quarter ended October 31, 2018 on Form 10-Q ("3Q 2019 10-Q"), signed by Defendant Felt, and accompanied by SOX certifications signed by Defendants James and Felt. In their SOX certifications, Defendants represented that, " this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report…" The Exchange Act Defendants further stated that they, "Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities***, particularly during the period in which this report is being prepared."

86. Regarding its enterprise business, the Exchange Act Defendants stated, "Given the higher average annual contract value (ACV) and renewal rates we experience with larger customers, we are focused on customers with over $100 million in revenue, ***with a particular emphasis on enterprise customers with over $1 billion in revenue***." The 3Q 2019 10-Q also reiterated the same misrepresentations regarding Domo's enterprise business and international business as contained in the 2Q 2019 10-Q. Further, Defendants once again represented billings as a "key business metric."

87. Regarding its international business, the 3Q 2019 10-Q repeated its prior misrepresentations and further stated:

> Revenue from customers with billing addresses in the United States comprised 82% and 77% or our total revenue for the three months ended October

> 31, 2017 and 2018, respectively, and 83% and 77% of our total revenue for the nine months ended October 31, 2017 and 2018, respectively. We are focused on growing our international business and will continue to invest in sales operations outside the United States.

88. The foregoing statements in the 3Q 2019 10-Q were false and misleading for the reasons stated in ¶ 74 herein.

89. On March 13, 2019, the Exchange Act Defendants held an earnings call to discuss further quarter 2019 results, during which Defendant James touted billings growth, Domo's enterprise business, and international business:

> We saw a 26% increase year-over-year in billings in Q4 and a year-over-year revenue growth of 31%.
>
> ***
>
> As part of our enterprise focus, we've also asked our corporate business to focus on larger and larger companies and we found quite a bit of success there. We experienced a 62% increase in business from customers between $250 million and $1 billion in revenue this quarter compared to the same quarter last year. A big part of our corporate business to me is enterprise-like in terms of the size of new deals, upsells, and renewals that we're seeing.
>
> ***
>
> And all the moves that we're making to improve our go-to-market in favor of enterprise are benefiting our corporate business.

90. On the call, Defendant Felt also emphasized billings growth and the Company's international and enterprise business, stating that:

> Billings grew 26% to $57.2 million.
>
> ***
>
> Our international operations continued to drive outsized growth and our EMEA business more than doubled its billings from last year's Q4. Our North American enterprise business exceeded expectations as well.
>
> ***
>
> we plan to generate $198 million of total billings in fiscal 2020. We expect $40 million to $41 million of billings to be generated in Q1.

***

> International represented 23% of revenue.

***

> So, on the billings guidance, to be clear, we're guiding $198 million in billings for the year and $40 million to $41 million in Q1.

91. The foregoing statements made on the earnings call were false and misleading for the reasons stated in ¶ 74 herein.

92. On April 15, 2019, Domo issued its first Annual Report on Form 10-K with the SEC following the IPO, reporting the Company's financial and operating results for the quarter and year ended January 31, 2019, signed by Defendants James and Felt (the "2019 10-K"). For fiscal 2019, the Exchange Act Defendants reported billings of $165.41 million, compared to billings of $129.54 million in fiscal 2018, and billings of $92.41 million in fiscal 2017.

93. With respect to billings in the 2019 10-K's "Key Business Metric" section, the 2019 10-K reiterated the statements contained in the Offering Documents.

94. In the 2019 10-K, the Exchange Act Defendants highlighted Domo's "***Quarterly Billings Trends***," which, although acknowledging that "[t]he increase in billings during the three months ended January 31, 2018 and 2019 is primarily from seasonality due to the buying patterns of our larger customers and the higher concentration of customers renewing their subscriptions in our fiscal fourth quarter," nonetheless touted an overall quarterly billings trend showing "improvement in billings . . . ***due to the acquisition of additional customers and sales of larger subscription contracts to existing customers, which are attributable to [Domo's] continued focus on selling to larger enterprise customers***" (emphasis added). Thus, the 2019 10-K assured investors that Domo's business strategies were succeeding, especially as they related to the

Company's larger enterprise customers, which purportedly drove the Company's acquisition of additional customers and sales. This billings trend was shown as follows (all figures in thousands):

| Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|
| **April 30, 2017** | **July 31, 2017** | **October 31, 2017** | **January 31, 2018** | **April 30, 2018** | **July 31, 2018** | **October 31, 2018** | **January 31, 2019** |
| $27,663 | $26,464 | $30,015 | $45,402 | $33,714 | $35,664 | $38,791 | $57,241 |

95. Notwithstanding the purported upward trajectory of Domo's billings, even as recently as fiscal 2019, the 2019 10-K contained the same generic, boilerplate representations as the Offering Documents concerning the risk that the Company's billings and ability to capture enterprise customers could fluctuate. These generic "catch all" warnings did not divulge Domo's actual known risks with respect to its billings and enterprise customer growth.

96. As with the Offering Documents, the 2019 10-K discussed the percentage of revenue Domo historically derived from its customers with United States addresses versus its international customers, touting the Company's increased focus on expanding its international footprint, which purportedly increased in fiscal 2019. For example, the 2019 10-K noted that "[r]evenue from customers with billing addresses in the United States comprised 86%, 82% and 77% of [Domo's] total revenue for the years ended January 31, 2017, 2018 and 2019, respectively," and continued to assure investors that the Company was "focused on growing [its] international business and will continue to invest in sales operations outside the United States."

97. Appended as an exhibit to the 2019 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Exchange Act Individual Defendants certified that "the

[2019 10-K] fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." They also represented that disclosure controls and procedures were in place "to ensure that material information elating to [Domo] is made known to us…"

98. The foregoing statements in the 2019 10-K were false and misleading for the reasons stated in ¶ 74 herein.

99. On June 6, 2019, the Exchange Act Defendants issued an earnings release attached to a Form 8-K signed by Defendant Felt and filed with the SEC, announcing quarterly results for the first quarter of fiscal 2020. Therein, the Exchange Act Defendants stated that billings were $41.1 million or 22% year over year growth. Defendant James continued to represent Domo's enterprise customer base as strong, stating, "I'm continually impressed how our customers, ***some of which are the world's biggest corporations***, are transforming their businesses by using our platform with our rapidly expanding portfolio of ***enterprise applications*** and advanced data offerings."

100. The same day, the Exchange Act Defendants held an earnings call to discuss first quarter results for fiscal 2020, during which Defendant James once again touted Domo's billings growth, enterprise and international business, stating:

> In Q1, we saw 28% year-over-year growth in revenue and 22% year-over-year growth in billings.
>
> ***
>
> Enterprise revenue grew 33% year-over-year, an acceleration from Q4.

101. Defendant Felt also spoke about the Company's billings growth, enterprise and international business, stating:

…we're executing well against our plan, billings grew 22% to $41.1 million.

***

International revenue represented 26% of total revenue, up from 22% in Q4.

102. The foregoing statements in the earnings release and on the related earnings call were false and misleading for the reasons stated in ¶ 74 herein.

103. On June 13, 2019, the Exchange Act Defendants filed Domo's Form 10-Q for the first quarter of 2019, ending April 30, 2019 ("1Q 2020 10-Q), signed by Defendant Felt, and accompanied by SOX certifications signed by Defendants James and Felt. In their SOX certifications, Defendants represented that, " this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report…" The Exchange Act Defendants further stated that they, "Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities***, particularly during the period in which this report is being prepared."

104. Regarding its enterprise business, the Exchange Act Defendants stated in relevant part:

> Given the higher average annual contract value (ACV) and renewal rates we experience with larger customers, we are focused on customers with over $100 million in revenue, with a particular emphasis on enterprise customers with over $1 billion in revenue.
>
> We had total revenue of $31.9 million and $40.8 million for the three months ended April 30, 2018 and 2019, respectively, reflecting a year-over-year increase of 28%. ***Our enterprise customers were a key driver of revenue growth***, with revenue of $14.6 million and $19.4 million for the three months ended April 30, 2018 and 2019, respectively, or 33% year-over-year growth.

The Exchange Act Defendants made clear that they were "focusing our sales and marketing activities toward enterprise customers."

105. Rather than disclose the specific risks then facing the Company's enterprise customer acquisition strategy, the Exchange Act Defendants reiterated the same generic boilerplate warnings contained in the Company's prior filings.

106. In the 1Q 2020 10-Q, the Exchange Act Defendants once again identified billings as Domo's "key business metric." They further stated that billings for the three months ended April 30, 2019 came to $41,065,000 as compared to $33,714,000 for the same period in 2018.

107. Moreover, the Exchange Act Defendants reiterated their prior misstatements regarding Domo's international business and further stated:

> ***Our long-term growth depends in part on being able to expand internationally on a profitable basis.*** Historically, we have generated a substantial majority of our revenue from customers inside the United States. For example, approximately 79% and 74% of our total revenue for the three months ended April 30, 2018 and 2019, respectively, was derived from sales within the United States. We have begun to expand internationally and plan to continue to expand our international operations as part of our growth strategy.
>
> *******
>
> As our international sales and operations increase, so too will the number and significance of transactions

108. The statements referenced in ¶¶ 69-107 were false and misleading because, 1) Domo experienced weakness in its enterprise and international businesses; 2) as a result, Domo faced an increased risk to its billings growth; 3) this created a high likelihood of material negative impact to the Company's financial results. Specifically, the Exchange Act Defendants failed to reveal that Domo struggled to develop and maintain a consistent go to market ("GTM") strategy. *Inter alia*, Domo had significant difficulty acquiring new enterprise customers because its platform could not integrate with other data sharing services, Domo targeted too many business segments

rather than taking a specialized and more targeted approach, Domo did not have a consistent sales message and defined identity, and Domo targeted its sales pitch at c-suite executives rather than data analysts when pitching potential customers. Unbeknownst to the market, Defendants overfocus on enterprise customer acquisition, despite these hurdles, as well as its ineffective efforts to grow internationally impacted in part by the overfocus on the enterprise business, negatively impacted billings and raised the risk that Domo could not sustain an accelerated (or even steady) rate of billings growth.

**The Truth Begins to Emerge**

109. On September 5, 2019, after-market hours, Domo issued a press release announcing its financial results for the second quarter of 2020, with guidance for the third quarter and full fiscal year 2020 that fell short of market expectations. Though touting billings growth throughout the Class Period, the Company revealed in the earnings release that Domo had suffered a deceleration of billings growth. Specifically, ***Domo reported billings growth of 9% year over year to $39 million versus the 17%, or $42 million in growth that had been expected. Moreover, management guided FY20 billings down to $172 million from $198 million prior.*** The Exchange Act Defendants also disclosed that they now expected third quarter revenue of $41.5-42.5 million versus a consensus of $44.2 million, and a loss of $1.04-1.00 per share versus a consensus of a $0.91 loss per share. Additionally, Defendants revealed a full year 2020 view with revenue of $168-169 million versus a consensus of $173.7 million, and a loss of $4.10-4.00 per share versus a consensus of a $3.82 loss per share.

110. The Exchange Act Defendants held an earnings call the same day during which Defendant James admitted to weakness in Domo's enterprise business and explaining that the ***billings growth deceleration came from an over focus on large enterprise transactions***,

specifically stating, "we were over focused in pursuing larger enterprise transactions which had an impact on Q2 billings. Defendant Felt elaborated on the reduced guidance and expectations that things would not improve any time soon. Specifically, Defendant Felt explained that:

> Now to discuss what we expect in Q3 and fiscal '20. We expect Q3 billings of about $36.5 million. We now expect fiscal year '20 billings to be about $172 million. Our billings guidance assumes the same business and operating conditions we experienced in Q2 will continue in Q3 and Q4…"

111. Indeed, though emphasizing the Company's focus on enterprise customers throughout the Class Period, Defendant Felt revealed on the earnings call that Domo's enterprise business was not as strong as previously hyped and Domo would now shift focus away from large enterprise customers to smaller customers though, as Defendant James admitted, "they don't have as much upsell potential as enterprise business." Specifically, Defendant Felt stated:

> And there was insufficient new customer activity to compensate for those efforts. Our enterprise customer count is now over 460. In response, we're applying more resources towards acquiring new customers and at the same time ***reallocating some of our large enterprise sales resources towards smaller enterprise customers***. (Emphasis added).

112. The Exchange Act Defendants also revealed weakness in its international business for the first time, explaining that despite their investment into international business, "they didn't perform. Defendant James disclosed that, "although historically, our international business has helped carry the day, this quarter, it was similarly impacted, particularly Asia Pac, not including Japan." Elaborating upon the revealed weakness in Domo's international business, Defendant James stated:

> And then the second piece that we talked about, in Asia Pac. Asia Pac was growing really well last year, and we put a lot of extra heads there, and it just didn't take the way that it had been performing those first 3 years, the incremental dollars that we put there. And it takes a while to figure out if they're going to perform. ***They didn't perform.***

113. Then, on September 6, 2019, during pre-market hours, JMP dropped its Domo target by $10.00 to $37.00, citing the "disappointing" report and guidance, weakness in Domo's enterprise and international businesses, and billings growth that was about half of what was expected.

114. Other analysts followed suit. Credit Suisse issued a report the same day lowering its price target from $45.00 to $20.00 and downgrading the stock from outperform to neutral. Like JMP, Credit Suisse cited "underwhelming F2Q20 results that saw billings decelerate to +9% y/y. We believe challenges in the enterprise business raise questions about the GTM shift, and the long term unit economics of the business." The Credit Suisse report also based its downgrade on Domo's revised downward FY20 outlook, including billings guidance of $172mn (vs $198 prior) which the analyst noted "implies prior commentary for net new ACV acceleration in FY20 is no longer applicable. Credit Suisse also based its valuation on Domo's "failure to refine and execute sales motion." In its model, Credit Suisse changed its expectations for the third quarter from 18% in year over year billings growth down to -6%, and for fiscal year 2020 from 20% down to 4%.

115. Cowen lowered its price target from $52 to $28, citing disappointing billings growth of 9%, far below Cowen's estimate of 18%, which "management attributed…to longer sales cycles for large enterprise deals..." Cowen noted Defendants' admission that Domo had, "***over-indexed its focus on large enterprise deals***, which carry longer sales cycles and less predictability, and as such is pivoting back to put more resources on transactional deals in the lower enterprise/upper commercial markets." Cowen further stated:

> Given the weaker execution in the enterprise business in 2Q and the new re-allocation of resources back into the commercial market, mgmt has reset guidance to assume 2H productivity levels do not improve from 2Q. Specifically, mgmt lowered FY20 revenue guidance from $173-$174 (+22% Y/Y) to $168-$169 mln (+18% Y/Y), and lowered billings guidance from $198 mln (+20% Y/Y) to $172 mln (+4% Y/Y).

> ***
>
> ***Clearly DOMO is still trying to find its footing with respect to the right go-to-market strategy.***
>
> ***
>
> DOMO guided 3Q billings of $36.5 mln (implying -6% Y/Y) vs. $46.8 mln consensus and our prior estimate of $47.1 mln.
>
> ***
>
> DOMO lowered FY20 revenue guidance from $173-$174 mln to $168-$169, below our $173.8 mln prior estimate and consensus of $173.6 mln. Billings are now expected to be $172 mln, below our/consensus prior estimate of $198 mln. EPS loss is now expected to be ($4.00)-($4.10) vs. prior guidance of ($3.79)-($3.87), worse than consensus of ($3.82) and our ($3.84) prior estimate.

116. Morgan Stanley lowered its price target from $47.00 to $24.00 citing the Q2 billings miss and disappointments in Domo's enterprise business given that management's representations regarding "a substantial enterprise pipeline of deals and a significant investment in sales capacity" caused "incorrect[] optimism… that the enterprise business would show evidence of acceleration." Morgan Stanley attributed Domo's "billings miss" to the enterprise business issues.

117. UBS lowered its 12-month price target from $28.00 to $18.00 citing "enterprise deals… push[ing] out of the quarter and billings to miss guidance" as well as "ongoing cash burn" that "limits Domo's operational flexibility and time to resolve challenges." Specifically, UBS based its valuation on the fact that, "billings at $38.8M were well below guidance of $42M as large deals failed to close. Domo added just 2 new enterprise customers in the quarter vs. 11 in the last quarter as sales cycles for enterprise deals elongated in the wake of go-to-market changes" and the reduction of FY20 billings guidance by 13%.

118. With the foregoing revelations of Defendants' fraud, Domo's stock price fell $9.44 per share, or 37.45%, to close at $15.77 per share on September 6, 2019, or 24.9% below the IPO price of $21.00.

**Defendants Also Violated Disclosure Obligations Under Item 303 and Item 503 of Regulation S-K**

119. Item 303 imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." *S.E.C. Release No. 6835*, 1989 WL 1092885, at *4; see also 17 C.F.R. § 229.303(a)(3). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required. *Id*.

120. Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty to:

> i. Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.
>
> ii. Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii) (emphasis added); see also S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

121. Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed. Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance

coverage; or the likely non-renewal of a material contract." *S.E.C. Release No. 6835*, 1989 WL 1092885, at *4 (May 18, 1989).

122. Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." See Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *Id*. at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

123. Item 503 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." Sec. Offering Reform, S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 CFR § 229.503(c). The discussion of risk factors:

> must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.

*Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers*, 1998 WL 425894, at *14 (July 29, 1998).

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

124. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Domo common stock in the IPO or purchased Domo common stock thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO; or (b) Domo securities during the Class Period; and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

125. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Domo securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Domo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

126. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

127. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

128. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public in the Offering Documents for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of Domo;
- whether the Securities Act Individual Defendants negligently prepared the Offering Documents for the IPO and, as a result, the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;
- whether the Exchange Act Individual Defendants caused Domo to issue false and misleading financial statements during the Class Period;
- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Domo securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

129. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

130. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Domo securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Domo securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

131. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

132. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Violations of Section 11 of the Securities Act Against All Defendants)**

133. Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

134. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Defendants.

135. The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

136. Domo is the registrant for the IPO. Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

137. As issuer of the shares, Domo is strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Offering Documents.

138. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

139. By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

140. Plaintiffs acquired Domo shares pursuant and/or traceable to the Offering Documents for the IPO.

141. Plaintiffs and the Class have sustained damages. The value of Domo securities has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### (Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)

142. Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

143. This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act.

144. The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Domo within the meaning of Section 15 of the Securities Act. The Securities Act Individual Defendants had the power and influence and exercised the same to cause Domo to engage in the acts described herein.

145. The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

146. By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)**

147. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

148. This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

149. During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to

defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Domo securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Domo securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

150. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Domo securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Domo's finances and business prospects.

151. By virtue of their positions at Domo, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Exchange Act Defendants knew

or recklessly disregarded that material facts were being misrepresented or omitted as described above.

152. Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control. As the senior managers and/or directors of Domo, the Exchange Act Individual Defendants had knowledge of the details of Domo's internal affairs.

153. The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Domo. As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Domo's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Domo securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Domo's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Domo securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

154. During the Class Period, Domo securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise

acquired shares of Domo securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Domo securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Domo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

155. By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

156. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

### (Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)

157. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

158. During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Domo, and conducted and participated, directly and indirectly, in the conduct of Domo's business affairs. Because of their senior positions, they knew the adverse

non-public information about Domo's misstatement of income and expenses and false financial statements.

159. As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Domo's financial condition and results of operations, and to correct promptly any public statements issued by Domo which had become materially false or misleading.

160. Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Domo disseminated in the marketplace during the Class Period concerning Domo's results of operations. Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Domo to engage in the wrongful acts complained of herein. The Exchange Act Individual Defendants therefore, were "controlling persons" of Domo within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Domo securities.

161. Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Domo. By reason of their senior management positions and/or being directors of Domo, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Domo to engage in the unlawful acts and conduct complained of herein. Each of the Exchange Act Individual Defendants exercised control over the general operations of Domo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

162. By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Domo.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class Representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: May 22, 2020

Respectfully submitted,

**PETERS | SCOFIELD**
*A Professional Corporation*

*/s/ David W. Scofield*
David W. Scofield
7430 Creek Road, Suite 303
Sandy, Utah 84093-6160
Telephone: (801) 322-2002 Ext. 102
Direct Dial: (801) 858-3402
Toll Free: (888) 296-3998
Facsimile: (801) 912-0320
Email: dws@psplawyers.com

**[Additional Counsel on Following Page]**

**POMERANTZ LLP**
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: taweinrib@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Attorneys for Plaintiffs***

**Bronstein Gewirtz & Grossman LLC**
Peretz Bronstein, Esq.
60 East 42nd Street – Suite 4600
New York, NY 10165-0006
Telephone: (212)-697-6484
Email: peretz@bgandg.com