Gregory L. Watts (*pro hac vice*)
Stephanie L. Jensen (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
701 Fifth Avenue, Suite 5100
Seattle, WA  98104
Telephone:  (206) 883-2500
Facsimile:   (206) 883-2699
gwatts@wsgr.com
sjensen@wsgr.com

Ignacio E. Salceda (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA  94304
Telephone:  (650) 493-9300
Facsimile:   (650) 493-6811
isalceda@wsgr.com

Gregory M. Saylin (9648)
Cory A. Talbot (11477)
HOLLAND & HART LLP
222 South Main St., Suite 2200
Salt Lake City, UT 84101
Telephone: (801) 799-5800
Facsimile:   (801) 799-5700
gmsaylin@hollandhart.com
catalbot@hollandhart.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| EXKAE Ltd., Lead Plaintiff, and MARISA ELLIS, JOHN MARBACH, JARRETT PATTON, and LISA DAVIS, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>DOMO, INC., JOSHUA G. JAMES, BRUCE FELT, FRASER BULLOCK, MATTHEW R. COHLER, DANA EVAN, MARK GORENBERG, NEHAL RAJ, and GLENN SOLOMON,<br><br>      Defendants. | Case No. 2:19-cv-00781-DAK-DAO<br><br>**DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Honorable Dale A. Kimball<br><br>Magistrate Judge Daphne A. Oberg |

# TABLE OF CONTENTS

STATEMENT OF RELIEF SOUGHT AND SPECIFIC GROUNDS FOR MOTION ................. 1

INTRODUCTION ......................................................................................................... 1

STATEMENT OF ALLEGED FACTS ........................................................................ 2

PROCEDURAL HISTORY ........................................................................................ 6

ARGUMENT ............................................................................................................. 7

I      THE COMPLAINT IS AN IMPERMISSIBLE PUZZLE PLEADING ........................... 7

II.     PLAINTIFFS FAIL TO STATE A SECTION 11 CLAIM ..................................... 7

     A.     Legal Standards ................................................................................ 7

     B      Plaintiffs Lack Standing to Pursue a Section 11 Claim ..................... 9

     C.     Plaintiffs Fail to Plead an Actionable False or Misleading Statement ................. 10

III.    PLAINTIFFS FAIL TO STATE A SECTION 10(B) CLAIM ........................... 16

     A.     Legal Standards ................................................................................ 16

     B.     No False or Misleading Statements During the Class Period ............. 17

     C.     Plaintiffs Fail to Plead a Strong Inference of Scienter ........................... 20

           1.     CW Allegations Do Not Support a Strong Inference of Scienter ............ 20

           2.     Mere Access Does Not Support a Strong Inference of Scienter ............. 22

           3.     Fraud by Hindsight Does Not Support a Strong Inference of Scienter ..... 23

           4.     Lack of Motive Undermines Inference of Scienter ................................. 24

           5.     A Shift in Strategy Does Not Support a Strong Inference of Scienter ...... 24

           6.     The Nonculpable Inference is Far More Compelling ............................... 25

IV.    PLAINTIFFS' CONTROL PERSON CLAIMS FAIL ........................................ 25

CONCLUSION ......................................................................................................... 25

i

# TABLE OF AUTHORITIES

## CASES

*Anderson v. First Sec. Corp.*,
249 F. Supp. 2d 1256 (D. Utah 2002)..............................................................23

*Anderson v. Spirit AeroSystems Holdings*,
827 F.3d 1229 (10th Cir. 2016) ..................................................... *passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................8, 10

*Barberan v. Nationpoint*,
706 F. Supp. 2d 408 (S.D.N.Y. 2010)...............................................22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................8

*City of Phila. v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ..............................................19, 23

*Davis v. Skullcandy, Inc.*,
2018 WL 1415192 (D. Utah Mar. 21, 2018) (unpublished) ............................21

*Emps.' Ret. Sys. of R.I. v. Williams Cos.*,
889 F.3d 1153 (10th Cir. 2018) .......................................................24

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) ........................................11, 12, 23

*Hampton v. root9B Techs., Inc.*,
897 F.3d 1291 (10th Cir. 2018) ......................................................11

*In re Atossa Genetics, Inc. Sec. Litig.*,
2014 WL 4983551 (W.D. Wash. Oct. 6, 2014) (unpublished),
*aff'd in part, rev'd in part & remanded by*
868 F.3d 784 (9th Cir. 2017) ...........................................................10

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ........................................................9, 10

*In re Imergent Sec. Litig.*,
2009 WL 3731965 (D. Utah Nov. 2, 2009) (unpublished)..............................24

*In re Initial Pub. Offering Sec. Litig.*,
227 F.R.D. 65 (S.D.N.Y. 2004) .......................................................10

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ................................................. *passim*

*In re SemGroup Energy Partners, L.P. Sec. Litig.*,
    729 F. Supp. 2d 1276 (N.D. Okla. 2010) ........................................................10

*In re Weinstein*,
    757 F.3d 1110 (10th Cir. 2014) .....................................................................23

*In re Zagg Inc. Sec. Litig.*,
    797 F.3d 1194 (10th Cir. 2015) ....................................................16, 20, 23, 24

*Joseph v. Wiles*,
    223 F.3d 1155 (10th Cir. 2000),
    *overruled in part on other grounds by*
    *Cal. Pub. Emps. Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017) ...........9, 10

*Katz v. Gerardi*,
    2010 WL 3034358 (D. Colo. Aug. 3, 2010) (unpublished), *aff'd*, 655 F.3d
    1212 (10th Cir. 2011)....................................................................................9

*Kessman v Myriad Genetics, Inc.*,
    2019 WL 1330363 (D. Utah Mar. 25, 2019) (unpublished) ..................... *passim*

*Krim v. pcOrder.com, Inc.*,
    402 F.3d 489 (5th Cir. 2005) .......................................................................10

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
    876 F.3d 541 (4th Cir. 2017) .......................................................................23

*Matthews v. LeBarge, Inc.*,
    2009 WL 3673087 (N.D. Okla. Nov. 2, 2009) (unpublished) .........................9

*McDonald v. Kinder-Morgan, Inc.*,
    287 F.3d 992 (10th Cir. 2002) .....................................................................11

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010).....................................................................................22

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
    761 F.3d 1109 (10th Cir. 2014)...........................................................13, 19, 21

*Northumberland Cty. Ret. Sys. v. Kenworthy*,
    2013 WL 5230000 (W.D. Okla. Sept. 16, 2013) (unpublished)....................10

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)...........................................................................8, 11, 12

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)........................................................................8, 9

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ..........................................................1, 2, 16, 25

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) .................................................................8

*Rumbaugh v. USANA Health Scis., Inc.*,
   2018 WL 5044240 (D. Utah Oct. 17, 2018) (unpublished)...........................7, 23

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977)...............................................................................22

*Sec. Sys. v. Alder Holdings, LLC*,
   421 F. Supp. 3d 1186 (D. Utah 2019)........................................................9

*Smallen v. The Western Union Co.*,
   950 F.3d 1297 (10th Cir. 2020) ..........................................................24, 25

*Sorkin, LLC v. Fischer Imaging Corp.*,
   2005 WL 1459735 (D. Colo. June 21, 2005) (unpublished) .........................22

*Spiegel v. Tenfold Corp.*,
   192 F. Supp. 2d 1261 (D. Utah 2002)..................................................12, 13

*Stoneridge Inv. Partners, v. Sci.-Atlanta, Inc.*,
   552 U.S. 148 (2008)...............................................................................16

*TDC Lending LLC v. Private Capital Grp., Inc.*,
   340 F. Supp. 3d 1218 (D. Utah 2018)........................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................16, 17, 22

*United Food & Commer. Workers Union Local 880 Pension Fund v. Chesapeake*
      *Energy Corp.*,
   774 F.3d 1229 (10th Cir. 2014) ...............................................................25

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
   2008 WL 4838671 (D. Colo. Nov. 6, 2008) (unpublished).............................10

*Zhang v. LifeVantage Corp.*,
   2017 WL 4142660 (D. Utah Sept. 18, 2017) (unpublished)............................22

*Zucco Partners LLC v. Digimarc Corp*,
   552 F.3d 981 (9th Cir. 2009) ..............................................................20, 21

## STATUTES

Private Securities Litigation Reform Act of 1995 (PSLRA),
    15 U.S.C. § 78u-4 ........................................................................................1, 16

15 U.S.C. § 78u-5(c)(1) ...............................................................................19

Securities Act of 1933, Section 11,
    15 U.S.C. § 77k ......................................................................... *passim*

Securities Act of 1933, Section 15,
    15 U.S.C. § 77o ......................................................................6, 25

Securities Exchange Act of 1934, Section 10(b),
    15 U.S.C. § 78j(b) ............................................................6, 8, 16, 17

Securities Exchange Act of 1934, Section 20(a)
    15 U.S.C. § 78t..................................................................................25

## RULES

Fed. R. Civ. P. 8(a), (d) ...........................................................................1, 7, 8

Fed. R. Civ. P. 9(b) ..................................................................................1, 8, 16

Fed. R. Civ. P. 12(b)(6)................................................................................1

Rule 10b-5, 17 C.F.R. 240.10b-5................................................................16, 22

**INDEX OF EXHIBITS**

| Exhibit | Document Description |
|---------|---------------------|
| 1 | Chart of Allegedly False or Misleading Statements |
| 2 | Excerpts of Domo's amended Registration Statement on Form S-1/A, filed with the Securities and Exchange Commission (the "SEC") on June 18, 2018 and deemed effective on June 28, 2018 |
| 3 | Excerpts of Domo's 2Q20 Earnings Call Transcript, dated September 5, 2019 |
| 4 | Excerpts of Domo's 2Q19 Press Release, filed on Form 8-K with the SEC on September 6, 2018 |
| 5 | Excerpts of Domo's 3Q19 Press Release, filed on Form 8-K with the SEC on December 6, 2018 |
| 6 | Excerpts of Domo's 2Q19 Earnings Call Transcript, dated September 6, 2018 |
| 7 | Excerpts of Domo's 4Q and FY19 Press Release, filed on Form 8-K with the SEC on March 13, 2019 |
| 8 | Excerpts of Domo's 3Q19 Earnings Call Transcript, dated December 6, 2018 |
| 9 | Excerpts of Domo's 1Q20 Press Release, filed on Form 8-K with the SEC on June 6, 2019 |
| 10 | Excerpts of Domo's 4Q19 Earnings Call Transcript, dated March 13, 2019 |
| 11 | Excerpts of Domo's 1Q20 Earnings Call Transcript, dated June 6, 2019 |
| 12 | Google LLC's Press Release, dated June 6, 2019 |
| 13 | Excerpts of Domo's 2Q20 Press Release, filed on Form 8-K with the SEC on September 5, 2019 |
| 14 | Salesforce.com, Inc.'s Press Release, filed on Form 8-K with the SEC on June 10, 2019 |
| 15 | Excerpts of Domo's FY20 Form 10-K, filed with the SEC on April 13, 2020 |
| 16 | Excerpts of Domo's 2Q19 Form 10-Q, filed with the SEC on September 13, 2018 |
| 17 | Excerpts of Domo's 3Q19 Form 10-Q, filed with the SEC on December 13, 2018 |
| 18 | Excerpts of Domo's 1Q20 Form 10-Q, filed with the SEC on June 13, 2019 |

**STATEMENT OF RELIEF SOUGHT AND SPECIFIC GROUNDS FOR MOTION**

Defendants Domo, Inc. ("Domo" or the "Company"), Joshua G. James, Bruce Felt, Fraser Bullock, Matthew R. Cohler, Dana Evan, Mark Gorenberg, Nehal Raj, and Glenn Solomon ("Defendants") move to dismiss with prejudice the Amended Class Action Complaint ("Complaint" or "¶ _"), ECF No. 42, pursuant to Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

**INTRODUCTION**

Plaintiffs challenge fifty-eight statements: eighteen statements in Domo's initial public offering ("IPO") documents (¶¶ 55–66), and forty made by the Company, Mr. James, or Mr. Felt following the IPO in quarterly press releases, earnings calls and SEC filings from September 5, 2018 to September 5, 2019 (¶¶ 70–107).[1] Plaintiffs and their so-called "confidential witnesses" exert energy alleging their second-guesses about Domo's chosen business strategies. But like a car with a broken transmission, these allegations do not propel the Complaint forward. Defendants disclosed not only the strategies in question, but also their associated risks to investors. While Plaintiffs allege that the impact of Domo's strategies was somehow hidden from investors, Defendants actually disclosed key metrics like billings, billings growth, revenue, revenue growth, and customer count in every quarter throughout the class period. And from the time of Domo's IPO until the Company experienced its first disappointing quarter—marking the end of the class period—Domo met or exceeded its quarterly forecasts for these metrics. Defendants' transparency and Domo's success belie both falsity and a strong inference of scienter, particularly when Plaintiffs fail to allege omissions that connect to purported misstatements or contemporaneous information at odds with Defendants' statements about Domo's business. "Problems and difficulties are the daily work of business people." *Ronconi v.*

---

[1] A Chart of Allegedly False and Misleading Statements is attached as Exhibit 1 to the Declaration of Stephanie L. Jensen in Support of Defendants' Motion to Dismiss, filed herewith. All references to "Ex. _" in this Motion are to Exhibits to the Jensen Declaration.

*Larkin*, 253 F.3d 423, 434 (9th Cir. 2001). Even the best-managed public companies, from time to time, suffer business disappointments and adverse developments, some significant enough to cause stock prices to drop. This is business. It is not fraud.

### STATEMENT OF ALLEGED FACTS

Founded in 2010, Domo, Inc. is a software company headquartered in American Fork, Utah. ¶¶ 2, 19, 34. Domo operates a cloud-based platform that provides employees with real-time access to key business data, enabling them to manage, analyze, and leverage this data from their smartphones. *Id*. On June 1, 2018, Domo filed a registration statement on Form S-1 with the Securities and Exchange Commission (the "SEC"), which, after amendment, was declared effective on June 28, 2018 (the "Registration Statement"). ¶ 36. On June 29, 2018, Domo filed a Prospectus with the SEC on Form 424B4 (referred to herein with the Registration Statement as the "Offering Documents") and commenced its IPO, after which Domo's Class B common stock began trading on the Nasdaq Global Market. ¶¶ 3–4. Domo's IPO closed on July 3, 2018. ¶ 4.

***Billings.*** From its IPO through the end of the purported class period, Domo identified "billings" as a "Key Business Metric." ¶ 6. Domo defines "billings" as total revenue plus the change in deferred revenue in a period. ¶ 59. Billings reflects sales to new customers, subscription renewals, and upsells to existing customers. *Id*. Domo generally invoices customers for subscriptions annually, but places the subscription in deferred revenue and recognizes it ratably over the contractual term. ¶ 59; Ex. 2 at 58-59. Domo disclosed billings in its Offering Documents and every quarter since. ¶¶ 56, 94. Domo has warned since before the IPO that it could experience variability in billings due to timing of large new subscriptions and renewals. ¶ 59. Since September 5, 2018, Domo forecasted quarterly and annual billings, but warned investors that given its relatively short corporate existence, it would have difficulty accurately forecasting billings and other operating results. Ex. 2 at 16–17 ("[o]ur limited operating history makes our ability to forecast future operating results difficult"); 10 (same); 20 (same). Domo

2

also disclosed that due to corporate buying patterns, it experiences higher billings in the fourth quarter and lower billings in the second and third quarters. Ex. 2 at 20.

 ***Enterprise Customers.*** Domo analyzes groups of customers by size, considering companies with more than $1 billion in annual revenue "enterprise" customers and those with less "corporate" customers. ¶¶ 5, 60, 104. While enterprise customers yield higher average annual contract values and renewal rates, Ex. 2 at 56, they come with risks. As Domo disclosed in its Offering Documents and since:

> We are increasingly targeting sales efforts at enterprise customers, . . . and face long sales cycles, complex customer requirements, substantial upfront sales costs and a relatively low and difficult to predict volume of sales on a quarter-by-quarter basis. This makes it difficult to predict with certainty our sales and related operating performance in any given period. Our typical sales cycle for new enterprise customers is approximately six months but is variable and difficult to predict and can be longer. Customers often undertake a prolonged evaluation of our platform, including assessing their own readiness, scoping the professional services involved, and comparing our platform to products offered by competitors and their ability to solve the problem internally. Events may occur during this period that affect the size or timing of a purchase or even cause cancellations, which may lead to greater unpredictability in our business and operating results.

*Id.* at 21 (emphasis added). Given the potential upside, and cognizant of the attendant risks, Domo disclosed in its Offering Documents and throughout the purported class period that its strategy was to focus on enterprise customers and larger corporate customers (with over $100 million in revenue). *Id.* at 56. Domo's strategy was effective: its enterprise customer base grew from 36 as of January 31, 2014, to 385 as of April 30, 2018 (1Q19[2]), to over 460 as of September 5, 2019 (2Q20, early 3Q20). ¶¶ 57, 111.

 ***International Customers.*** At the time of the IPO, Domo disclosed that it was also focused on growing internationally, ¶ 62, and that its "long-term growth depend[ed] in part on

---

  [2] Domo's fiscal year ends on January 31. Accordingly, Domo's FY2019 ended January 31, 2019 and its FY2020 ended January 31, 2020. Domo's 1Q19 ended April 30, 2018; 2Q19 ended July 31, 2018; 3Q19 ended October 31, 2018; 4Q19 ended January 31, 2019; 1Q20 ended April 30, 2019; and 2Q20 ended July 31, 2019.

being able to expand internationally on a profitable basis." Ex. 2 at 29. Domo cautioned that it lacked reference customers in new international markets, that there were challenges in attracting, integrating, and retaining international employees, and that this strategy required its investments in operations to be successful. *Id.* at 29–31. This strategy was also successful with revenue from international customers keeping pace with Domo's growing total revenue, accounting for 23% of Domo's revenue 2Q19 through 4Q19, ¶¶ 72, 78, 87, 90, and 26% of Domo's revenue in 1Q20 (ended 4/30/19) and 2Q20 (ended 7/31/19). ¶ 101; Ex. 3 at 7.

***Class Period Success.*** Throughout the purported class period, Domo experienced great success as measured by both <u>billings</u> and <u>revenue</u>. On September 6, 2018, Domo announced its 2Q19 results (ended 7/31/18), reporting billings of $35.7 million and revenue of $34.3 million, <u>year-over-year increases of 35% and 32%, respectively</u>. ¶¶ 70, 72, 94, Ex. 4 at 1.

On December 6, 2018, Domo announced its 3Q19 results (ended on 10/31/18), reporting billings of $38.8 million and revenue of $36.8 million, <u>year-over-year increases of 29% and 30%, respectively</u>. ¶¶ 81, 94; Ex. 5 at 1. These results <u>exceeded</u> Domo's forecasts for the quarter of $35.7 million in billings and $34.8 to $35.2 million in revenue. Ex. 4 at 1-2; Ex. 6 at 7.

On March 13, 2019, Domo announced its 4Q19 and FY19 results (ended 1/31/19), reporting 4Q19 billings of $57.2 million and revenue of $39.4 million, <u>year-over-year increases of 26% and 31%, respectively</u>, and total FY19 billings of $165.4 million and revenue of $142.5 million, <u>year-over-year increases of 28% and 31%, respectively</u>. ¶¶ 89-90, 92, 94; Ex. 7 at 1. These results <u>exceeded</u> Domo's forecasts for the quarter of $50 million in billings and $37.5 to $37.9 million in revenue. Ex. 5 at 2; Ex. 8 at 7, 16.

On June 6, 2019, Domo announced its 1Q20 results (ended 4/30/19), reporting billings of $41.1 million and revenue of $40.8 million, <u>year-over-year increases of 22% and 28%, respectively</u>. ¶ 99; Ex. 9 at 1. These results <u>exceeded</u> Domo's forecasts for the quarter of $40 to $41 million in billings and $40 to $41 million in revenue. Ex. 7 at 1-3; Ex. 10 at 6, 9. On an

earnings call that same day, Domo also disclosed a 33% year-over-year increase in enterprise customer revenue. ¶¶ 100, 104 (repeated in 10-Q). During that call, Mr. James, Domo's CEO, addressed Google's announcement that same day that it was going to acquire Domo competitor Looker for $2.6 billion, stating that Domo remained hopeful about its place among its competitors. Ex. 11 at 13; Ex. 12 at 1.

On September 5, 2019, Domo announced its 2Q20 results (ended 7/31/19), reporting billings of $39 million and revenue of $41.7 million, <u>year-over-year increases of 9% and 22%, respectively</u>. ¶ 10; Ex. 13 at 1 (9/5/19 PR). While revenue was within Domo's forecasted range for the quarter, billings growth fell short of Domo's forecast of 17%. *Id*. In an earnings call that same day, Domo cautiously decreased its FY20 billings forecast from $198 million to $172 million and decreased its FY20 revenue forecast from a range between $173 and $174 million to a range between $168 to $169 million, which still constituted a year-over-year increase of 18%. ¶¶ 10, 90 109; Ex. 3 at 7. On the earnings call, Mr. James explained that the disappointing 2Q20 results and reduced FY20 forecast were the result of longer-than-expected sales cycles with potential international and enterprise customers. Noting that the "timing of larger enterprise [sales] closings" was always "hard to predict[,]" Mr. James stated that Google's announcement that it would acquire Domo competitor Looker for $2.6 billion and Salesforce's subsequent 2Q20 announcement that it would acquire Domo competitor Tableau Software for $15.7 billion caused many potential enterprise customers to pause and reevaluate the market, extending the sales process. Ex. 3 at 5, 11-13; Ex. 14 at 1. Mr. James said Domo's international business was similarly impacted. ¶ 112. Though Domo was hopeful that the 2Q20 disappointment was merely the result of delayed sales, Mr. Felt, Domo's CFO, stated that the Company would reallocate some sales resources to smaller enterprise and larger corporate customers. *Id.* at 6-7, 13.

Domo's optimism proved to be well-founded. Domo ultimately reported achieving $189.2 million in billings for FY20, well in excess of its revised FY20 forecast of $172 million.

Ex. 15 at 59. Domo ultimately reported achieving $173.4 million in revenue for FY20, exceeding its revised FY20 forecast of $168 to $169 million and achieving almost exactly the mid-point of its original FY20 revenue forecast of between $173 and $174 million. *Id*. at 53.

All told, Domo experienced strong annual revenue growth throughout the purported class period that <u>met or exceeded</u> the Company's forecasts every quarter:



Domo also experienced strong billings growth since well before its IPO through the purported class period and beyond, reporting billings of $92.4 million, $129.5 million, $165.4 million, and $189.2 million for its fiscal years ended January 31, 2017, 2018, 2019, and 2020, respectively, ¶¶ 56, 92, Ex. 15 at 59. And, as shown in the chart above, with the sole exception of fiscal 2Q20 (ended 7/31/19), Domo <u>met or exceeded</u> its quarterly billings forecasts from fiscal 3Q19 (ended 10/31/18, the first fiscal quarter for which it provided a quarterly billings forecast) through the end of the purported class period.

**PROCEDURAL HISTORY**

This lawsuit was filed on October 17, 2019 alleging violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), with a putative class period of June 28, 2018 through

September 5, 2019.[3] ECF No. 2. On April 7, 2020, EXKAE Ltd. ("EXKAE") was appointed Lead Plaintiff. ECF No. 35. The operative Complaint was filed on May 22, 2020.

## ARGUMENT

## I.    THE COMPLAINT IS AN IMPERMISSIBLE PUZZLE PLEADING

Rule 8(a) requires that Plaintiffs plead a "short" and "plain" statement of their claim, and Rule 8(d) specifies that each averment be "simple, concise, and direct." Fed. R. Civ. P. 8(a), (d). Courts do not tolerate complaints where plaintiffs present "puzzles," leaving it up to defendants and the court to sort out what the misleading statements are, and to match the statements up with the reasons they are allegedly false or misleading. *See, e.g., Rumbaugh v. USANA Health Scis., Inc.*, 2018 WL 5044240, at \*3-5 (D. Utah Oct. 17, 2018) (unpublished) (citing cases lamenting puzzle-pleading and the burden it places on readers to sort the alleged misrepresentations and match them with corresponding adverse facts) (citations omitted).

Here, Plaintiffs plead vague allegations from twelve so-called "confidential witnesses" or "CWs" that question the wisdom of Domo's disclosed "go to market" strategy, ¶¶ 40–54, but fail to tie these allegations to particular misstatements or omissions. ¶¶ 55-66, 70-107. Plaintiffs instead recite a conclusory set of omissions, ¶¶ 67–68, 71, 74, 108, often simply referring to earlier recitations in short form, ¶¶ 80, 84, 88, 91, 98, 102, but never explain how they render any statement false or misleading. Making sense of Plaintiffs' puzzle pleading is neither the duty of Defendants nor this Court. The Complaint should be dismissed for this reason alone.

## II.   PLAINTIFFS FAIL TO STATE A SECTION 11 CLAIM

### A.    Legal Standards

To state a claim under Section 11 of the Securities Act, Plaintiffs must plead facts sufficient to show that the Registration Statement either contained a false statement of material

---

[3] Plaintiffs conflictingly state the class period starts on both June 28, 2018 (¶ 1) and June 29, 2018 (¶ 69). June 28, 2018 presumably is a typographical error, as Domo's Class B common stock did not begin trading on the Nasdaq Global Market until June 29, 2018. ¶¶ 4, 37, 69.

fact or omitted material facts necessary to make a challenged statement not misleading. *See* 15 U.S.C. § 77k(a). In determining whether Plaintiffs meet their burden, the Court must review a challenged statement in the context of the entire document, *i.e.*, "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). "[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether . . . the belief [was] wrong," *id.* at 186, unless a plaintiff can "identify particular (and material) facts going to the basis for the issuer's opinion[,]" the omission of which makes the opinion misleading, *id.* at 194.

Section 11 claims must satisfy Rule 8(a), which requires that a complaint state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court need not accept "bare assertion[s]" or "conclusory" or "speculative" allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). Where the facts pled do not permit the court to infer more than the "mere possibility" of misconduct, the complaint "stops short of the line between possibility and plausibility" and must be dismissed. *Iqbal*, 556 U.S. at 678-79 (citation omitted). It is not enough to allege facts that are "merely consistent" with a claim: the facts must be "suggestive" of that claim. *Twombly*, 550 U.S. at 556–57, 567.

But where, as here, plaintiffs allege a theory of fraud that runs from the IPO through the putative class period based upon the same alleged omissions, *compare* ¶¶ 67-68 (Section 11) to ¶¶ 71, 74, 80, 84, 88, 91, 98, 102, 108 (Section 10(b)), and allege that certain Section 11 defendants "knew" these omissions or "adverse facts" were "being concealed from the public," ¶¶ 7, 23, 31, the Section 11 claim "sounds in fraud" and the complaint must meet the heightened pleading requirements of Rule 9(b). *See, e.g., Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (applying Rule 9(b) to Section 11 claims because they "sound[ed] in fraud"); *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (Rule 9(b) applies to Section 11

8

claims "premised on allegations of fraud."); *Sec. Sys. v. Alder Holdings, LLC*, 421 F. Supp. 3d 1186, 1194-96 (D. Utah 2019) (quoting *Matthews v. LeBarge, Inc.*, 2009 WL 3673087, at *1 n.2 (N.D. Okla. Nov. 2, 2009), which in turn quotes *Rombach*, 355 F.3d at 171).

**B.      Plaintiffs Lack Standing to Pursue a Section 11 Claim**

*Lead Plaintiff Lacks Section 11 Standing*. Lead Plaintiff EXKAE acquired 237,202 shares of Domo's Series D-2 preferred stock on June 6, 2017, *i.e.*, over a year before the IPO. ECF No.18-2. On June 15, 2018 (two weeks before the IPO), Domo conducted a 15-to-1 reverse stock split and Lead Plaintiff's 237,202 shares of Series D-2 preferred stock converted into 15,813 shares of convertible preferred stock, which then automatically converted into Class B common shares as the IPO proceeds passed $50 million net of fees. Ex. 2 at F-24. Since Lead Plaintiff bought its Domo stock over a year before the IPO, it is impossible for Lead Plaintiff to plead or prove that its stock was "sold in an offering covered" by the Registration Statement. *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000), *overruled in part on other grounds by Cal. Pub. Emps. Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017); *see also* 15 U.S.C. § 77k; *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106-07 (9th Cir. 2013) (plaintiff must have bought the stock "directly" in the IPO or be able to trace it back to the IPO); *Katz v. Gerardi*, 2010 WL 3034358, at *7 (D. Colo. Aug. 3, 2010) (unpublished) (only purchasers have Section 11 standing), *aff'd*, 655 F.3d 1212 (10th Cir. 2011).

*The Other Plaintiffs Similarly Lack Section 11 Standing.* Implicitly conceding that Lead Plaintiff lacks standing, the Complaint includes four additional plaintiffs: Jarrett Patton, Marisa Ellis, John Marbach, and Lisa Davis. ECF No. 42. Each of these four individuals lack Section 11 standing because the earliest any of them purchased shares was on March 21, 2019, ECF Nos. 2-2, 42-1, 42-2, 42-3, over nine months after the IPO and well after an additional 12,490,147 shares of Domo Class B common stock became eligible for sale in the market on December 26, 2018 upon expiration of the 180-day lock-up provision, Ex. 2 at 40–41, 131. Plaintiffs thus

purchased their Domo shares from a mixed or "polluted" pool of stock, over <u>54%</u> of which were non-IPO shares,[4] and fail to meet their tracing burden. *See, e.g., Century Aluminum*, 729 F.3d at 1106 (affirming dismissal due to plaintiffs' failure to "trace the chain of title for their shares back to the [offering], starting with their own purchases and ending with someone who bought directly in the [offering]"); *Krim v. pcOrder.com, Inc.,* 402 F.3d 489, 495-96 (5th Cir. 2005) (same); *In re Atossa Genetics, Inc. Sec. Litig.*, 2014 WL 4983551, at *5 (W.D. Wash. Oct. 6, 2014) (unpublished) (dismissing Section 11 claim because plaintiff bought shares "after 50,122 unregistered shares became available for sale," noting federal courts "have consistently held that shares bought on the market after unregistered shares have entered the market cannot be traced back to the IPO"), *aff'd in part, rev'd in part & remanded by* 868 F.3d 784 (9th Cir. 2017); *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 119 (S.D.N.Y. 2004) ("section 11 class periods [ ] must end [ ] when unregistered shares became tradeable").[5]

### C. Plaintiffs Fail to Plead an Actionable False or Misleading Statement

In their Section 11 claim, Plaintiffs challenge 18 statements in the Registration Statement. ¶¶ 55–66; Ex. 1. These statements are not materially false or misleading because they are: (i)

---

[4] Plaintiffs allege Domo sold 10,580,000 shares of Class B common stock in the IPO, including an underwriter over-allotment. ¶ 4; Ex. 2 at 131. When the IPO closed, Domo had 23,070,147 shares of Class B common stock outstanding (12,490,147 + 10,580,000), Ex. 2 at 125, 131, and thus over 54% of the Company's total outstanding shares of Class B common stock had not been sold pursuant to the Registration Statement and became eligible for sale in the open market on December 26, 2018, 180 days after the IPO. Ex. 2 at 131.

[5] While a few district courts within this Circuit have found sufficient conclusory allegations that a plaintiff's stock was purchased "pursuant and/or traceable to" the offering, these decisions contravene the Tenth Circuit's holding in *Joseph* that an aftermarket purchaser only has Section 11 standing "so long as he can prove the securities he bought were those sold in an offering covered by the false registration statement." 223 F.3d at 1159. With over half of Domo's shares eligible for sale at the time of plaintiffs' purchases being non-IPO shares, plaintiffs' stock is not traceable to the IPO. *See Iqbal*, 556 U.S. at 678. In *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 4838671, at *7 (D. Colo. Nov. 6, 2008) (unpublished), plaintiffs alleged they purchased shares on the day of the offering. Here, the first purchase was not until nearly nine months after the IPO and after 12.5 million non-IPO shares were eligible for sale in the market. *Northumberland Cty. Ret. Sys. v. Kenworthy*, 2013 WL 5230000 (W.D. Okla. Sept. 16, 2013) (unpublished) and *In re SemGroup Energy Partners, L.P. Sec. Litig.*, 729 F. Supp. 2d 1276, 1305 (N.D. Okla. 2010) cited no Tenth Circuit authority for support.

accurate statements of past performance, (ii) nonactionable opinions or statements of corporate optimism, (iii) forward-looking statements protected by the "bespeaks caution" doctrine, (iv) nonactionable risk factors, and/or (v) not materially misleading due to the alleged omissions.

***Accurate Statements of Historical Fact.*** Accurate statements about past performance are "not actionable as a matter of law." *See McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002). Many of the challenged statements are of Domo's historical performance metrics of the number of billings, and revenue from total, enterprise and international customers (Statements 1, 4, 7, 10, 12), historical investments in the Company's platform and sales team (Statements 3, 5), definitions of customer and billing metrics (Statements 7, 8), descriptions of how the Company bills customers for subscriptions (Statement 9), and go-to-market strategies (Statements 11, 14). ¶¶ 56-62, 64; Ex. 1. Plaintiffs do not contest that these historical facts and definitions were accurate when made.[6]

***Nonactionable Opinions and Statements of Corporate Optimism.*** "'[P]ure statements of opinion,' . . . and 'statements of optimism that are not capable of objective verification' are not material misstatements unless they inaccurately represent 'the speakers' beliefs concerning then-present factual conditions[.]" *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018) (quoting *Omnicare*, 575 U.S. at 187; *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119, 1123 (10th Cir. 1997)). Plaintiffs cannot "second-guess inherently subjective and uncertain assessments" or play "Monday morning quarterback." *Omnicare*, 575 U.S. at 186. An opinion is actionable only if a plaintiff can show it is subjectively false, the speaker did not conduct a

---

[6] The one exception is the allegation that Domo changed its definition of "enterprise customer." ¶¶ 40, 49. This allegation is based on CW1, who left Domo before the IPO, and CW7, who left Domo shortly after the IPO. *Id.* Their respective tenures indicate that any changes to the definition were internal and made before Domo filed its Registration Statement and commenced its IPO. There is no indication that Domo changed its definition during the class period. Moreover, CW7 was an inbound account development manager, one of the lowest, entry-level positions at Domo, who at most says broader definitions of enterprise were used for internal sales goals, ¶ 49; CW7 says nothing about the definition used externally with investors.

"meaningful . . . inquiry" or the opinion does not "fairly align[] with the information in the issuer's possession at the time." *Id*. at 189, 199.

Here, Statements 2, 3, 6, 13, 16, and 17 are just such statements. Ex. 1. Statements 2 and 3 communicated Defendants' opinion that Domo's investment in broad platform capabilities, scalability and security, characterized as "Proven Enterprise Readiness," positioned it well for future success. ¶ 57. The Tenth Circuit has previously found immaterial a similar statement of "proven integration experience[.]" *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) (finding "loosely optimistic statements that are so vague, so lacking in specificity" to be non-actionable). Statement 6 communicated Defendants' belief that Domo's expanding customer base was an important indicator of market penetration and poised it for future growth. ¶ 58. Statement 13 communicated Defendants' belief that Domo was "well-poised to capitalize on global digital transformation" and had "assembled an experienced management team to execute on this global opportunity." ¶ 63. Statements 16 and 17 communicated Defendants' belief that the market for its platform was "large and underpenetrated" and posed a "substantial opportunity to add additional customers both in the United States and internationally." ¶ 65. Plaintiffs fail to allege that Defendants disbelieved these opinions when they were made, failed to conduct a meaningful inquiry, or that these opinions did not fairly align with information available at the time. *See Level* 3, 667 F.3d at 1340.

***Bespeaks Caution Doctrine Protects Forward-Looking Statements.*** The bespeaks caution doctrine "provides a mechanism by which a court can rule as a matter of law (typically on a motion to dismiss for failure to state a cause of action or a motion for summary judgment) that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *Novell*, 120 F.3d at 1120-21 (citation omitted); *Spiegel v. Tenfold Corp.*, 192 F. Supp. 2d 1261, 1268 (D. Utah 2002) (bespeaks caution doctrine immunized registration statement where risk disclosures were tailored

to future projections). Here, many of the challenged statements are partially or wholly forward-looking statements regarding Domo's future objectives to expand its "footprint" with "enterprise customers" (Statement 5), expand its customer base in both the U.S. and internationally (Statements 6, 12, 17), capitalize on "global digital transformation" (Statement 13), and "develop a select number of third-party relationships" (Statement 15). ¶¶ 57, 58, 62-65; Ex. 1. These statements were accompanied by cautionary language. *See supra* at 3; *infra* at 13-14.

***Nonactionable Risk Factors.*** Plaintiffs allege that Statements 9 and 18 are false or misleading because they are "boilerplate" risk factors that "were not tailored to Domo's actual known risks." ¶¶ 59, 66; Ex.1. Given that the disclosure warned of the precise issues that ultimately materialized in 2Q20 and led to the Company's less-than-expected billings growth that quarter, it is unclear what more Plaintiffs believe Domo should have said. *See supra* at 3. Indeed, these risk factors are so well-tailored that they render Defendants' other statements inactionable. *See supra* at 10-13; *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1119 (10th Cir. 2014) (statement was inactionable where the company disclosed that "an essential premise of the opinion rested on a judgment . . . that could well fail to bear out"); *Spiegel*, 192 F. Supp. 2d at 1268 (finding risk factors were substantive and inactionable insofar as they explained that Defendants may not meet their projections).

Statement 9 says "[b]ecause [Domo] generate[s] most of [its] revenue from customers who are invoiced on an annual basis and have a wide range of annual contract values, [Domo] may experience variability due to typical enterprise buying patterns and timing of large renewals." Ex. 2 at 58; ¶ 59. Statement 18 explains at length the risks posed by its intent to "increasingly target[] sales efforts at enterprise customers[.]" Ex. 2 at 21; ¶ 66. These risks included: (1) a "variable and difficult to predict" sales cycle lasting "six months" or longer that involved "prolonged evaluation" of Domo's platform in comparison to "products offered by competitors"; (2) "implementation challenges" and "complicated installations"; and (3) a sales

13

cycle "heavily weighted toward the end of the quarter" which "greatly increases the likelihood that sales cycles will extend beyond the quarter in which they are forecasted to close." Ex. 2 at 21. Domo warned that these risks made it "difficult to predict volume of sales on a quarter-by-quarter basis," or "operating performance in any given period," and could "adversely impact" quarterly "billings and new customer acquisition metrics." *Id*.

***Nonactionable Omissions.*** Plaintiffs claim the Registration Statement omitted material facts. ¶¶ 67–68. These alleged omissions are inactionable because they are untethered to any statement that was rendered misleading by their omission, are contradicted by the alleged facts, were actually disclosed, and/or Domo had no duty to disclose them.

(a)    Go-to-Market Strategy. Plaintiffs claim Domo struggled to develop a successful go-to-market strategy. ¶ 67. Specifically, Plaintiffs allege that Domo "targeted too many business segments," *id.*, a strategy one CW described as "a mile wide and an inch deep," ¶ 41, rather than taking a "more targeted approach," ¶ 67; *see also* ¶¶ 8, 41. Putting aside the wisdom of this strategy, Domo disclosed it in the Registration Statement, stating it had "invested significantly to broaden [its] platform capabilities," Ex. 2 at 8, and would "continue to enhance and broaden the capabilities of [its] platform." *Id*. at 9. Indeed, the Registration Statement disclosed that building Domo was "like building seven start-ups in one" because it provided tools for "business intelligence, data warehouse, data discovery, analytics, collaboration, dashboarding, visualization" and "reporting" that are "typically provided by separate vendors." *Id*. at 1. It also disclosed that Domo offered more than 500 connectors and a "library" of universal connectors that "power over one hundred thousand" datasets across a "broad range of sources." *Id*. at 2. Regardless, Plaintiffs do not plead if or how this strategy resulted in weak billings or reduced sales to enterprise or international customers, or how this explicitly disclosed broad platform strategy rendered a single challenged statement misleading.

14

Plaintiffs allege that Domo targeted "c-suite executives" when it should have targeted "data analysts." ¶¶ 5, 8, 43, 44, 67. Even if true, Domo disclosed this strategy in the Registration Statement. Ex. 2 at 1 ("we targeted CEOs as a key user of our platform"). Plaintiffs also allege that Domo had an inconsistent sales pitch, ¶¶ 47, 67, spent "too much" on marketing, ¶ 46, and did not spend its international marketing budget "effectively," ¶ 39. These allegations reflect nothing more than a few former employees' disagreement with Domo's chosen sales approach. Again, Plaintiffs do not plead if or how this approach resulted in weak billings or reduced sales, or how this explicitly disclosed strategy can be materially false or misleading.

(b)     <u>Enterprise and International Business</u>. Plaintiffs claim Domo failed to disclose it was experiencing weakness in its enterprise and international businesses. ¶ 68. But this claim is contradicted by the alleged facts that (a) Domo's enterprise customers grew from 36 as of January 31, 2014, to 385 as of April 30, 2018 (1Q19), to over 460 as of September 5, 2019 (2Q20, early 3Q20), ¶¶ 57, 111, and (b) Domo's revenue from international customers kept pace with Domo's growing total revenue, accounting for 23% of Domo's revenue 2Q19 through 4Q19, ¶¶ 72, 78, 87, 90, and 26% of Domo's revenue in 1Q20 (ended 4/30/19) and 2Q20 (ended 7/31/19). ¶ 101; Ex. 3 at 7.

(c)     <u>Billings</u>. Plaintiffs allege that Domo's billings growth had "dramatically slowed." ¶ 68. But this claim is contradicted by the alleged facts that Domo's billings consistently grew leading up to and at the time of the IPO. ¶ 56 ("billings had increased from $92.41 million in [FY17] to $129.54 million in FY18"); ¶ 92 (billings increased to $165.4 million in FY2019). It also is contradicted by the alleged fact that Domo achieved significant billings and revenue growth, and exceeded quarterly forecasts for both, in every quarter following the IPO until the quarter ending July 31, 2019 (2Q20). *See supra* at 4-6.

Plaintiffs characterize these alleged omissions as "hurdles." ¶¶ 8, 67, 74. But "[p]roblems and difficulties are the daily work of business people. That they exist does not make a lie" out of Defendants' more general statements about Domo's business. *See Ronconi*, 253 F.3d at 434.

## III.   PLAINTIFFS FAIL TO STATE A SECTION 10(B) CLAIM

### A.   Legal Standards

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead, among other elements, a "material misrepresentation or omission" and "scienter." *Stoneridge Inv. Partners, v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Level 3*, 667 F.3d at 1333. In addition to satisfying Rule 9(b)'s particularity requirements, Section 10(b) claims must satisfy the heightened pleading requirements of the PSLRA, which the Tenth Circuit acknowledges is a "heavy burden" for Plaintiffs. *Level 3*, 667 F.3d at 1333; *see also* 15 U.S.C. § 78u-4(b)(1).

To plead falsity, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." *Level 3*, 667 F.3d at 1333 (quoting 15 U.S.C. § 78u-4(b)(1)).

"To adequately allege scienter, a 'complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind[,]'" which "for § 10(b) claims is 'a mental state embracing intent to deceive, manipulate, or defraud, or recklessness.'" *Kessman v Myriad Genetics, Inc.*, 2019 WL 1330363, at *6 (D. Utah Mar. 25, 2019) (unpublished) (citing § 78u-4(b)(2)(A); *Anderson v. Spirit AeroSystems Holdings*, 827 F.3d 1229, 1236-37 (10th Cir. 2016)). In securities fraud cases, recklessness "is a high bar," akin to conscious disregard" and "closer to 'a state of mind approximating actual intent.'" *In re Zagg Inc. Sec. Litig.*, 797 F.3d 1194, 1201, 1206–07 (10th Cir. 2015) (citation omitted). To plead a "strong inference" of scienter, as required by the PSLRA, a plaintiff must plead an inference of fraudulent intent that is "cogent" and "compelling," "more

than merely plausible or reasonable," and "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 314, 423 (2007). In determining this, a court must engage in a holistic analysis that includes consideration of "plausible, nonculpable explanations for the defendant's conduct." *Id*. at 323–24; *see also Kessman*, 2019 WL 1330363, at *6.

### B.     No False or Misleading Statements During the Class Period

Plaintiffs fail to plead a false or misleading statement under Section 10(b) for the same reasons they fail to plead one under Section 11. *See supra* Section II.C.

***Accurate Statements of Historical Fact.*** Many of the post-IPO challenged statements are of Domo's historical performance metrics of total billings and percentage of growth in total billings throughout the class period. *See* Ex. 1 (Statements 19, 21, 22, 32, 34, 35, 40-42, 45, 49, 51, 52, 57). Plaintiffs do not contest that these historical billings and growth in total billings metrics were accurate. These disclosed metrics eviscerate any notion that Defendants were hiding Domo's billings or any deceleration in Domo's billing growth. ¶¶ 71, 74, 80, 84, 88, 91, 98, 102, 108. Until Domo disclosed its 2Q20 disappointment in September 2019, the Company achieved and disclosed billings, ¶ 94, that exceeded its forecast for the quarter, and year-over-year billings growth of 35% in 2Q19, 29% in 3Q19, 26% in 4Q19, and 22% in 1Q20. *See supra* at 4-6. Plaintiffs also challenge historical metrics of revenue and revenue growth during the purported class period, but again do not contest that they were accurate. *See* Ex. 1 (Statements 51, and 54). And Domo achieved and disclosed revenue throughout the purported class period that met or exceeded its forecast for the quarter, and year-over-year revenue growth of 32% in 2Q19, 30% in 3Q19, 31% in 4Q19, 28% in 1Q20, and 22% in 2Q20. *See supra* at 4-6. Plaintiffs also challenge the historical metric of growth in international revenue, but do not allege it was inaccurate. *See* Ex. 1 (Statements 23, 30, 39, 41, 47, 52, 58). Domo achieved and disclosed that international customers kept pace with Domo's growing total revenue, accounting for 23% of

Domo's revenue 2Q19 through 4Q19, ¶¶ 72, 78, 87, 90, and 26% of Domo's revenue in 1Q20 and 2Q20. ¶ 101; Ex. 3 at 7. Finally, Plaintiffs challenge the historical metric of growth in enterprise revenue, but admit it was disclosed during the purported class period, ¶¶ 100, 104, and do not contend it was inaccurate. *See* Ex. 1 (Statements 40, 51, 54).

*Nonactionable Opinions and Corporate Optimism.* Statements 20, 22, 24, 25, 27, 28, 33, 40, 44, and 50 are or contain nonactionable corporate optimism, opinions, and/or puffery. ¶¶ 70, 72, 73, 76, 81, 89, 94, 99. These statements are inactionable. *See supra* at 11-12. *In Level 3*, the Tenth Circuit sorted through alleged misstatements, and only deemed as material those that were "particularly concrete[,]" and "could have, and should have had, some basis in objective and verifiable fact." *Id.* at 1340-41. Whereas those statements that were "incapable of objective verification"—even if they were on a topic that was of importance to investors—they were deemed immaterial. *Id.* at 1340. Also immaterial were all of the "'rosy affirmation[s] commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity . . . that no reasonable investor could find them important.'" *Id.*[7] (citation omitted). Additionally, even statements that may arguably be capable of objective verification are nonetheless inactionable because, unlike in *Level 3* where plaintiffs alleged two detailed internal reports, 667 F.3d at 1341, Plaintiffs have failed to allege any "facts on the ground" showing that the statements were false or misleading when made. The Complaint is devoid of any facts inconsistent with Statements 20, 27, 28, 33, 40, and 44.[8]

---

[7] Here, such unverifiable statements include Statements 22 ("everything looks great in terms of the customer bases"; "excellent job at building their business"); 24 ("strong performance"; "strong enterprise referrals"; "we have the right strategies"); 25 ("we're seeing just the beginning of all the effort that we've put into enterprise sales, enterprise sales management and marketing and marketing focus"); 40 ("all the moves that we're making to improve our go-to-market in favor of enterprise are benefiting our corporate business"); 50 ("I'm continually impressed how our customers, some of which are the world's biggest corporations, are transforming their businesses by using our platform with our rapidly expanding portfolio").

[8] Statements 20 ("IPO has given us the capital needed to successfully execute our business plan"); 27 ("to encourage wider and more strategic adoptions" Domo was "shifting our sales and marketing activities towards enterprise customers"); 28 ("we believe will result in larger initial new customer ACV and more upsell ACV potential"; "we have made significant investments in

***Safe Harbor Protection.*** The PSLRA's Safe Harbor provides that defendants "shall not be liable" for forward-looking statements "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1); *see also MHC*, 761 F.3d at 1115 n.4.

Here, nine of the forty post-IPO statements Plaintiffs challenge as misleading fall squarely within the Safe Harbor. *See* Ex. 1 (Statements 20, 22, 28, 30, 33, 35, 39, 41, 58); ¶¶ 70, 72, 76, 78, 81, 83, 87, 90, 107. These statements were each accompanied by meaningful cautionary language. Three of the statements (Statements 22, 35, 41) were made on a quarterly earnings call, at the beginning of which the Company warned investors it would contain forward-looking statements and encouraged investors to consult the risk factors discussed in the Company's press releases and SEC filings. *See* Exs. 6, 8, 10. Four of the statements (Statements 28, 30, 39, 58) were made on Forms 10-Q, which likewise warned investors that they contained forward-looking statements. *See* Exs. 16-18. And two of the statements (Statements 20, 33) were made in press releases, which specified that they contained forward-looking statements. *See* Exs. 4, 5. Plaintiffs fail to allege actual knowledge of falsity, as required by the Safe Harbor. *See City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1263, 1269 (10th Cir. 2001).

***Nonactionable Risk Disclosures.*** For the same reasons set forth above, Statements 29, 46, and 55 (¶¶ 77, 95, 105) are not misleading and are so well-tailored that they render Defendants' other statements inactionable. *See supra* at 13-14.

***Nonactionable Omissions.*** As in their Section 11 claim, throughout their Section 10(b) claim Plaintiffs refer to a near identical list of purported omissions. ¶¶ 71, 74, 80, 84, 88, 91, 98, 102, 108. These omissions fail for the same reasons set forth above. *See supra* at 14-16.

---

research and development to build our platform and to offer enterprise customers the features and functionality that they require"); 33 ("Demand for our products and services continues to grow as enterprises around the globe embrace digital transformation and push our products deeper into their business processes"); 40 ("we've also asked our corporate business to focus on larger and larger companies and we found quite a bit of success there"; "A big part of our corporate business to me is enterprise-like in terms of the size of new deals, upsells, and renewals that we're seeing"); 44 (billings increase attributable "to continued focus on selling to larger enterprise customers").

Moreover, facts like total billings, billings growth, revenue, revenue growth, international revenue growth, and enterprise revenue growth were disclosed quarterly and therefore cannot constitute omissions. *See supra* at 2-6.

*SOX Certifications.* Plaintiffs challenge as false or misleading Mr. James' and Mr. Felt's SOX certifications (Statements 26, 36, 48, 53) attached to the 10-K and 10-Qs issued throughout the purported class period. ¶¶ 75, 85, 97, 103. However, Plaintiffs fail to state a claim as to each because they merely attest that the certifier is not aware of material misstatements. *See Zagg*, 797 F.3d at 1205 ("Plaintiffs' 'bare allegation that Pedersen lied when he certified the filings pursuant to [Sarbanes-Oxley] adds nothing substantial to the scienter calculus.'") (quoting *Zucco Partners, LLC v. Digimarc Corp*, 552 F.3d 981, 1003–04 (9th Cir. 2009)).[9]

### C.   Plaintiffs Fail to Plead a Strong Inference of Scienter

#### 1.   CW Allegations Do Not Support a Strong Inference of Scienter

To rely on statements of CWs in support of scienter, Plaintiffs must satisfy at least two requirements. First, the CWs must be described with sufficient particularity to establish their reliability and personal knowledge. *See Anderson*, 827 F.3d at 1244. Second, the CWs' statements must be indicative of scienter, *i.e.*, they must show that, at the time a defendant is alleged to have made a materially misleading statement, the defendant was aware of the misleading nature of its statement. *See Level 3*, 667 F.3d at 1344–45; *Kessman*, 2019 WL 1330363, at *8.

Here, not a single CW put forth by Plaintiffs satisfies these requirements. Not one of the dozen CWs was even employed by Domo through the entire purported class period. CW1, CW5, and CW12 were not employed by the Company at the time of the IPO <u>or at any point during the class</u>. ¶¶ 40, 52, 54. All three of these former employees left the Company by spring

---

[9] Plaintiffs also plead the requirements of Items 303 and 503 of Regulation S-K, but do not once allege whether or how either of these Items were violated by Defendants, or, if violated, whether they fall within Plaintiffs' Section 11 or Section 10(b) claims. ¶¶ 119–123.

2018, <u>prior</u> to the IPO, and cannot be relied upon as to the inner workings of the Company during the class period, let alone to Mr. James' or Mr. Felt's knowledge or mental state during such time. *See Davis v. Skullcandy, Inc.*, 2018 WL 1415192, at *5 (D. Utah Mar. 21, 2018) (unpublished) (rejecting as "flaw[ed]" statements from former employees who "left the company before key events described in the Complaint transpired"); *Kessman*, 2019 WL 1330363, at *8 (no strong inference of scienter where CWs were "too far removed from the [defendants] and did not provide sufficiently particularized accounts of what the [defendants] must have known") (quoting *Anderson*, 827 F.3d at 1244; *Zucco*, 552 F.3d at 998).

Plaintiffs also fail to allege the particularized details necessary for any of the CW statements to be reliable or supportive of scienter. CW1 purports to have disagreed with Mr. James about Domo's strategy before the IPO, but cannot provide any information as to what Mr. James knew or believed during the class period. ¶ 41. CW3, CW4, CW8, CW9, CW10, and CW12 are not alleged to have met with or even spoken to Mr. James or Mr. Felt, let alone about issues supporting an inference of their scienter during the class period. ¶¶ 44, 46, 48, 50, 52, 53. CW6 claims that Mr. James attended some meetings with potential customers, but provides no details regarding who the customers or other Domo participants were, the dates of the meetings, or what was communicated. Since CW6 was a "staff accountant," it is unlikely that CW6 attended any of these customer sales meetings. ¶ 47. *See Kessman*, 2019 WL 1330363, at *8 (allegations that defendants attended meetings where issue was discussed did "not meet the high standard required to establish a strong inference of scienter") (citing *MHC*, 761 F.3d at 1122 (rejecting "defendants' routine attendance at finance meetings" to "suggest a 'cogent' and 'compelling' inference of scienter")); *see also Level 3*, 667 F.3d at 1344.

CW9 alleges that Mr. James "knew that Domo's marketing message was flawed," ¶ 48, and CW8 alleges that Mr. James "kept really close tabs" on "billings growth." ¶ 53. Conclusory

allegations of this kind do not come anywhere close to a "cogent," "compelling," and "powerful" inference of scienter. *Tellabs*, 551 U.S. at 323, 24; *Zhang v. LifeVantage Corp.*, 2017 WL 4142660, at *8 (D. Utah Sept. 18, 2017) (unpublished) (rejecting CW statement that failed to include "specific, detailed allegations regarding the [defendant's] knowledge of the false statements and his specific attempts to mislead"); *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735, at *11 (D. Colo. June 21, 2005) (unpublished) ("Conclusory allegations and information attributed to unreliable sources do not collectively create a strong inference of fraud").

CW3 and CW10 claim Domo missed its forecasts and goals, ¶¶ 44, 50, but the Complaint and the documents incorporated by reference therein plead that Domo met or passed its billings and revenue forecasts throughout the class period. *See supra* at 2-5. CW4 and CW11 provide irreconcilable explanations for Domo's alleged sales struggles: one claims Domo was too rigid and focused on "enterprise customers," and the other claims Domo's strategy "shift[ed]" too often. ¶¶ 46, 51. Such contradictions do not support a strong inference of scienter. *See, e.g., Barberan v. Nationpoint*, 706 F. Supp. 2d 408, 413 n.3 (S.D.N.Y. 2010) (the alternative pleading rule "cannot be construed as an invitation [for] incoherent, self-contradictory pleadings").

CW1, CW2, CW3, CW4, CW6, CW9, CW11, and CW12 allege disagreements with Domo's strategy. ¶¶ 41, 43, 44, 46–48, 51, 52. But Rule 10b-5 was never intended to protect against "mismanagement." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479–80 (1977); *see also Sorkin*, 2005 WL 1459735, at *9 ("poor management is not actionable under the securities laws") (citation omitted); *Merck & Co. v. Reynolds*, 559 U.S. 633, 649 (2010) (no scienter where inference only is that defendant acted "negligently").

## 2. Mere Access Does Not Support a Strong Inference of Scienter

Rather than plead facts to support scienter, Plaintiffs suggest that the Defendants should have known Domo's statements were misleading "[b]y virtue of their positions at Domo." ¶ 151.

The Tenth Circuit has "rejected the notion that knowledge may be imputed solely from an individual's position within a company." *Zagg*, 797 F.3d at 1205 (citation omitted); *see also Kessman*, 2019 WL 1330363, at *8.

Plaintiffs' related attempt to infer scienter by referencing Defendants' access to information is similarly unavailing. ¶ 23. Mere access to information does not equate to knowledge or even recklessness. *See In re Weinstein*, 757 F.3d 1110, 1114 (10th Cir. 2014) (no scienter where "Plaintiffs have not shown anything more than alleged knowledge of arguably material facts"); *Anderson v. First Sec. Corp.*, 249 F. Supp. 2d 1256, 1270 (D. Utah 2002) ("General allegations" of "access to information is not sufficient to allege scienter.").

Plaintiffs allege that Defendants had access to sales data on Netsuite and Domo's internal platform, ¶¶ 35, 45, 54, but notably missing are any allegations as to what information these platforms provided to Defendants that contradicted their public statements. *See TDC Lending LLC v. Private Capital Grp., Inc.*, 340 F. Supp. 3d 1218, 1228 (D. Utah 2018) ("plaintiff must specifically identify the facts a defendant had access to that contained red flags."). Even if Defendants knew some contradictory fact, it still does not "necessarily suggest an intent to mislead." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017).

### 3. Fraud by Hindsight Does Not Support a Strong Inference of Scienter

By alleging that Defendants should have anticipated a disappointing 2Q20 and failing to allege any facts showing why, Plaintiffs engage in impermissible fraud by hindsight. But "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Fleming*, 264 F.3d at 1260 (citation omitted); *see also Novell*, 120 F.3d at 1124 ("securities claims will not be based on 'fraud by hindsight'"); *Rumbaugh*, 2018 WL 5044240, at *9 (same).

### 4.   Lack of Motive Undermines Inference of Scienter

Typical securities fraud complaints allege some form of motive or substantial benefit received by the Defendants. Such allegations are conspicuously absent here. Plaintiffs do not allege that Mr. James or Mr. Felt sold their Domo stock during the class period. And the Complaint pleads facts showing that Mr. James beneficially owned over 591,000 shares of Domo's Class B common stock and over 3,263,00 shares of Domo's Class A common stock during the purported class period, ¶ 20, Ex. 2 at 123; meaning few, if any, investors lost more total value in their Domo stock holdings than Mr. James when the Company disclosed disappointing results September 2019. "Although the absence of an apparent motive does not necessarily defeat a finding of scienter, it does make such a finding more difficult to sustain." *Kessman*, 2019 WL 1330363, at *8 (quoting *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1173 (10th Cir. 2018); citing *Level 3*, 667 F.3d at 1347); *see also Smallen v. The Western Union Co.*, 950 F.3d 1297, 1311 (10th Cir. 2020) (absence of motive "weigh[s] against a finding of scienter") (citation omitted); *Anderson*, 827 F.3d at 1238–39 (the "absence of a particularized motive" is a "factor mitigating against an inference of scienter"); *In re Imergent Sec. Litig.*, 2009 WL 3731965, at *11 (D. Utah Nov. 2, 2009) (unpublished) (it "strains reason" that executives would "jeopardize [their] reputation[s]" or risk civil liability to no personal advantage).

### 5.   A Shift in Strategy Does Not Support a Strong Inference of Scienter

That Defendants acknowledged lower than anticipated billings growth in 2Q20 does not suggest they saw it coming. *See Anderson*, 827 F.3d at 1249. Nor does it support an inference of scienter for Domo to state in its 2Q20 conference call its intention to shift its focus to be more evenly distributed between large enterprise and smaller enterprise/large corporate customers going forward. *See Zagg*, 797 F.3d at 1205 ("[T]he implementation of the [new] policy…[is] at most an acknowledgment that the company identified a better way of doing things moving forward, not an indicator that fraudulent intent existed at the time the alleged omission occurred.") (citation omitted).

24

### 6.      The Nonculpable Inference is Far More Compelling

To survive dismissal, the Court must find cogent and compelling Plaintiffs' inferences that Defendants: (a) knew for well over a year that Domo's billings would disappoint in 2Q20 despite the fact that during this period the Company was exceeding its billings and revenue forecasts each and every quarter and achieving significant year-over-year billings and revenue growth; (b) believed they could somehow hide a deceleration in the percentage of billings and revenue growth in plain sight since the Company disclosed this information every quarter; and (c) engaged in a motiveless, profitless fraud.

The far more compelling inference is the nonculpable one: (a) Defendants saw the benefits of focusing on enterprise customers, but recognized and disclosed the associated risks at the IPO and throughout the class period; and (b) this strategy proved successful until 2Q20 when the baseline risk of a long and unpredictable sales cycle was exacerbated by a surprise industry consolidation that caused customers to pause and evaluate their changing options, thereby pushing sales into later periods. *See Anderson*, 827 F.3d at 1246 (no scienter where statements were merely "overly optimistic"); *Ronconi*, 253 F.3d at 432 ("Honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness.").

## IV.     PLAINTIFFS' CONTROL PERSON CLAIMS FAIL

Having failed to sufficiently plead predicate Section 11 or 10(b) claims, Plaintiffs cannot state claims under Section 15(a) of the Securities Act, or Section 20(a) of the Exchange Act. *See United Food & Commer. Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp*., 774 F.3d 1229, 1233 (10th Cir. 2014); *Smallen*, 950 F.3d at 1315.

### CONCLUSION

For the foregoing reasons, Plaintiffs fail to plead falsity or, for the Section 10(b) claim, a strong inference of scienter. The Complaint should be dismissed with prejudice.

RESPECTFULLY SUBMITTED this 9th day of July 2020.

**HOLLAND & HART LLP**

*/s/ Gregory M. Saylin*
Gregory M. Saylin
Cory A. Talbot

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

*/s/ Gregory L. Watts*
Gregory L. Watts *(pro hac vice)*
Ignacio E. Salceda *(pro hac vice)*
Stephanie L. Jensen *(pro hac vice)*

*Attorneys for Defendants Domo, Inc., Joshua G. James, Bruce Felt, Fraser Bullock, Matthew R. Cohler, Dana Evan, Mark Gorenberg, Nehal Raj, and Glenn Solomon*