IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION


EXKAE Ltd., Lead Plaintiff, and MARISA )
ELLIS, JOHN MARBACH, JARRETT           )
PATTON, and LISA DAVIS, individually   )
and on behalf of all others similarly  )
situated,                              )
                    Plaintiffs,        )        Case No.
                                       )
vs.                                    )        2:19-CV-781-DAK
                                       )
DOMO, INC., JOSHUA G. JAMES, BRUCE     )
FELT, FRASIER BULLOCK, MATTHEW R.      )
COHLER, DANA EVAN, MARK                )
GORENBERG, NEHAL RAJ, and GLENN        )
SOLOMON,                               )
                    Defendants.        )
_____)


BEFORE THE HONORABLE DALE A. KIMBALL

--------------------------------------

November 18, 2020

Defendants' Motion to Dismiss for Failure to State a Claim

Zoom Hearing


REPORTED BY: Patti Walker, CSR, RPR, CP    801-364-5440

351 South West Temple, #8.431, Salt Lake City, Utah  84101

A P P E A R A N C E S

For Plaintiffs:                        Tamar A. Weinrib
                                       POMERANTZ LLP
                                       600 Third Ave., 20th Floor
                                       New York, NY  10016


For Defendants:                        Cory A. Talbot
                                       Gregory M. Saylin
                                       HOLLAND & HART LLP
                                       222 South Main Street, #2200
                                       Salt Lake City, Utah  84101


                                       Gregory L. Watts
                                       Stephanie L. Jensen
                                       WILSON SONSINI GOODRICH &
                                         ROSATI PC
                                       701 Fifth Ave., #5100
                                       Seattle, WA  98104


                                       Ignacio E. Salceda
                                       WILSON SONSINI GOODRICH &
                                         ROSATI PC
                                       650 Page Mill Road
                                       Palo Alto, CA  94304

SALT LAKE CITY, UTAH; WEDNESDAY, NOV. 18, 2020; 2:00 P.M.

PROCEEDINGS

THE COURT:  We're on a Zoom hearing this afternoon in the matter of EXKAE Ltd., et al., vs. Domo, Inc., et al., 2:19-781.  Appearing for the plaintiff is Tamar Weinrib -- for the plaintiffs.  And for defendants, Stephanie Jensen, Mr. Ignacio Salceda, Mr. Gregory Saylin, and Mr. Cory Talbot, and Mr. Gregory Watts.

Who will be arguing for defendant?

MR. WATTS:  Gregory Watts, Your Honor.  Thank you.

THE COURT:  Thank you.

Well, this is your motion to dismiss for failure to state a claim, so go ahead, Mr. Watts.

MR. WATTS:  Thank you, Your Honor.

May it please the Court, plaintiffs' amended securities class action complaint should be dismissed with prejudice without leave to amend.  It fails to state a claim in the three most fundamental ways a security class action complaint can fail.

First, as to both the Exchange Act and the Securities Act claims, it fails to plead a false statement of material fact or an omission of material fact necessary to make a challenged statement not misleading.

Second, as the Exchange Act claims, it failed to plead a strong inference of scienter required by the Private

Secure Litigation Reform Agent, or the PSLRA.

Third, as to the Securities Act claims, plaintiffs lack standing to pursue a Section 11 claim because they did not purchase nor can they trace their Domo stock to the company's initial public offering in a registration statement.

Before addressing each of these three fundamental failures of the amended complaint, I would like to provide the Court with a very brief chronology of events and summarize some key facts, all of which are alleged in the complaint or offer incorporated by reference.

Plaintiffs allege a class period that starts with Domo's IPO on June 29, 2018, extends for over 14 months, and spans into reporting of Domo's financial results for five fiscal quarters, and ends on September 5, 2019, when Domo recorded disappointing quarterly results for the quarter ending July 31, 2019.

In the IPO registration statement and in the company's periodic SEC filings thereafter, Domo disclosed its business strategies, namely, a focus on companies with over one billion dollars in annual revenue that Domo characterized as enterprise customers, a focus on international customers, a marketing pitch focused on C-Suite for senior executives, and a development of a broad platform comprised of data connectors, a digital warehouse,

a data engine, applications, and visualization tools.

In the IPO registration statement and in the periodic SEC filings thereafter, Domo disclosed the risks associated with these business strategies, particularly the risks of focusing its sales efforts on enterprise customers. Domo disclosed those enterprise focused risk factors as long sales cycles, as long as six months or longer, complex customer requirements, prolonged evaluation of Domo's platform, heightened competition, substantial up-front sales costs, low and difficult to predict volume of sales on a quarterly basis, cancellations, and difficulty projecting with certainty sales and related operating performance metrics.

Domo's IPO closed on July 3rd, 2018.  Less than a month later, on July 31st, 2018, Domo completed its second fiscal quarter.

On September 6, five weeks later, as is the typical quarterly disclosure cadence for publicly traded companies, Domo disclosed year-over-year 32 percent growth in revenue and 35 percent growth in billings.

On December 6, 2018, a quarter later, Domo disclosed its third fiscal quarter results with year-over-year 30 percent growth in revenue and 29 percent growth in billings.  These results exceeded the projections Domo had previously provided for the third quarter.

On March 13th, 2019, Domo disclosed its fourth quarter results with year-over-year 31 percent growth in revenue and 26 percent growth in billings.  These results again exceeded Domo's projections for the quarter.

On June 6, 2019, Domo disclosed its first fiscal quarter of fiscal year 2020 with year-over-year 28 percent growth in revenue and 22 percent growth in billings.  Again, these results exceeded Domo's projections for the quarter.

And then on September 5th, 2019, Domo disclosed its second fiscal quarter results with year-over-year 22 percent growth in revenue and nine percent growth in billings.  While the revenue growth was within Domo's forecasted range, Domo's billings were below its projection of 17 percent growth.

Plaintiffs do not dispute that these reported quarterly figures were accurately disclosed.

What do these figures tell us?  First, these figures tell us that from the time of Domo's IPO and the start of plaintiffs' class period, and over the course of an entire fiscal year, four fiscal quarters, Domo achieved record revenue and billings, and exceeded both its revenue and billings projections each and every quarter.

Second, these figures tell us that Domo publicly disclosed every quarter accelerating year-over-year growth percentages in revenue and billings during the class period.

Year over year, quarterly revenue growth went from 32 percent to 30, to 31, to 28, to 22 percent over the course of the class period.  Year-over-year quarterly billings growth went from 35 percent to 29, to 26, to 22, to nine percent over the course of the class period.  These alleged and undisputed facts show that the amended complaint does not make sense.

Plaintiffs argue in their opposition to defendants' motion that Domo's business strategies, again, focus on enterprise, international customers, marketing pitch to C-Suite executives, developing a broad platform, created, in their words, insurmountable obstacles for growing Domo's business.  Okay.  If that were true, then how was Domo able to surmount these supposedly unsurmountable obstacles for an entire year, following the IPO?

Quarter after quarter, Domo employed the same business strategies that were criticized by plaintiffs' so-called confidential witnesses.  Quarter after quarter, Domo exceeded its revenue and billings projections, and quarter after quarter, Domo continued to grow year over year at an enviable rate between 32 and 28 percent in revenue and between 35 and 22 percent in billings.

Now plaintiffs argue in their opposition to defendants' motion that Domo provided, in their words, nary a hint that its billings growth rate faced significant risk

of deceleration.  Okay.  If that were true, then how do plaintiffs explain away the fact that Domo disclosed growth rate to the investing public every single quarter throughout the class period?

These publicly disclosed billings growth rates show a deceleration from 35 percent to 29, to 26, to 22, and then finally to nine percent over the course of the class period.

I guess plaintiffs got one thing right. Defendants did not hint at a risk of billings growth acceleration.  Defendants instead disclosed it as it happened every quarter throughout the class period.  I guess plaintiffs' theory is that this acceleration was hidden in plain sight.

Now at this point I think it is worth asking the question what do plaintiffs believe defendants should have disclosed and when.  At the time of the IPO, should defendants have prophetically and precisely predicted it would have a disappointing quarter in billings growth a year later?  Should defendants have predicted after any of its quarters following the IPO, quarters in which Domo exceeded revenue in billings, growth projections, that the next quarter would fail for the first time to achieve both projected metrics?  If so, what would be the basis for this pessimism?

Plaintiffs can only argue that Domo's disclosed business strategies spelled doom for the company and that this impending doom was somehow known by the defendants.

But here's the problem.  Domo disclosed all of these business strategies and their attendant risks to investors, and there is no indication that Domo's business strategies changed since before its IPO in June 2018 through the end of the class period in September of 2019.  Thus the very business strategies plaintiffs point to as their reasons for a disappointing July 31, 2019 quarter -- reasons, I would add, plaintiffs utterly fail to support with any specific allegations linking them to those disappointing results -- were the actual reasons Domo had an exceptional series of fiscal quarters for an entire year following the IPO.

Now when Domo disclosed disappointing billings results marking the end of plaintiffs' purported class period on December 5th, 2019, Mr. James and Mr. Felt, Domo's CEO and CFO, stated that in hindsight, Domo may have overfocused on larger enterprise customers and was going to reallocate some sales resources to smaller enterprise customers.  Smaller within that enterprise band meant these were enterprise customers closer to that one billion dollar annual revenue number, but not far exceeding that number, and also to focus on larger commercial customers, skilled

big businesses, but just below the billion dollars in annual revenue.

This realization in September of 2019 and slight pivot in business strategy does not mean there was an overfocus in prior quarters or that these individuals knew during those prior quarters that Domo was too focused on larger enterprise customers.  Hindsight is often 20/20 and is not an admission.  It does not mean that the conditions always existed or that these executives always knew they existed.

Now the amended complaint does not allege a strong inference of scienter.  It does not point to any contemporaneous information that contradicted the individual defendants' public statements at the time they were made. Plaintiffs rely on 12 former employees that neither individually nor collectively raise a strong reference of scienter.  They can be grouped into the few categories.

Three former employees were gone before the IPO and before the start of the class period.  Those are employees numbered in the complaint as employees one, five, and 12.  Six former employees were gone very early in the class period at a time when Domo was exceeding its quarterly projections for revenue and billings.  These so-called confidential witnesses, former employees, were numbered in the complaint as numbers two, three, four, seven, nine,

and 11.

Seven former employees are not alleged to have had any interaction with individual defendants, let alone any interaction of substance related to the allegations raised in the complaint.  These are witnesses number three, four, six, eight, nine, ten, and 12.

Eight of these former employees were low-level employees with little more than a knothole view through defense of Domo's business, with a limited perspective and unqualified to provide any credible statements about Domo's overall business.  They were witnesses numbered two through four, six through eight, ten, and 12.

Now more generally, all 12 of the former employees failed to provide any information about the individual defendants' state of mind during the class period.  All 12 former employees failed to provide any specifics about any meetings, reports, e-mails, or other internal documents that contradict the individual defendants' statements at the time they were made.  And all 12 former employees failed to name a single lost customer or potential customer, a single enterprise sale by revenue or billings that failed to close or was delayed due to Domo's business strategy, a strategy plaintiffs claim was deficient and the cause of Domo's disappointing billing results in the quarter end of July 2019.

Now this complaint is unusual in that plaintiffs do not allege that any of the individual defendants sold a single share of company stock during the class period. Moreover, Mr. James, Domo's CEO, owned approximately 3.9 million shares of Domo stock, meaning that it is difficult to imagine an individual who lost more total value in Domo stock when the class period ended than he. While motive is not an essential element of a strong inference of scienter, the absence of a motive weighs against such an inference.

I would like to address that for a moment, Your Honor, our standing argument as to the Securities Act, Section 11 claim. Our motion is pretty simple, and that is that lead plaintiff EXKAE bought its Domo stock too early and that the other plaintiffs bought their stock too late to be --

THE COURT: Mr. Watts, in your view, can someone ever have standing if they bought outside the class period? What's the standard, in your view, for standing with respect to when you purchased?

MR. WATTS: So I'll divide it into before and after. So if you purchased your securities before the initial public offering and that those securities are not registered pursuant to that registration statement, then you are not a purchaser and cannot be a Section 11 plaintiff.

Now on the end of it is that if you purchase your stock in the open market long enough after the IPO that unregistered shares have entered the market and polluted that pool of shares, you cannot trace your shares back to that IPO or to that registration statement, and therefore tracing is broken, you do not have standing to bring a claim.  That is what happened here.

EXKAE bought Domo preferred stock in June of 2017, over a year before Domo's IPO.  When Domo's IPO proceeds passed 50 million in net fees, in late June of 2018, these preferred shares of Domo stock were converted into Domo common stock.  EXKAE did not nor could it do anything to cause or prevent the conversion of its shares from preferred to common.

The key point is that EXKAE's investment decision, its purchase of Domo securities took place in June 2017, not in June 2018.  Its shares were not sold in the IPO and were not registered under the IPO's registration statement. Stock must be sold and offering covered by the registration statement.  Here, they were not sold in the IPO and they were not covered by the IPO's registration statement.

Lead plaintiff relies on the Ninth Circuit Hildes decision and plays games with the use of the word conversion.  Hildes was involved in the exchange of stock in company A for stock in company B.  It was not a conversion.

Here lead plaintiffs' preferred stock was automatically converted into common stock of the same company, Domo.  In Hildes, the plaintiff's company B stock was covered by the challenged registration statement.

Here, EXKAE stock was not covered by Domo's IPO registration statement.  In Hildes, the plaintiff relied upon that registration statement in voting in favor of the merger and therefore by acquiring his company B stock.

THE COURT:  So your view is that Hildes is not persuasive here?

MR. WATTS:  Completely distinguishable because it was an exchange of company A stock for company B stock, and there was an investment decision being made, a vote on a merger, and a reliance upon a registration statement, and incoming stock to the plaintiff was stock that was registered under that registration statement.  None of those facts are present here in this case.

Pivoting now to the other plaintiffs in this case, not the lead plaintiff, the other plaintiffs bought their stock too late, over nine months after Domo's IPO, in a polluted pool or market comprised of more unregistered than registered shares.  Months before these plaintiffs bought their Domo stock, nearly 12.5 million shares were released from their IPO related lockups and were eligible for sale in the market.

By the time of the earliest purchase by any of these plaintiffs, 54 percent of all the stock eligible for sale in the market was not registered and not covered by the IPO.  Under these circumstances, courts around the country have held that purchasers do not have Section 11 standing because tracing is impossible.

We've cited the Court to the Krim decision from the Fifth Circuit, Century Aluminum from the Ninth, and then also cases from federal courts in New York and Washington.

As the Southern District of New York succinctly stated, quote, Section 11 class periods must end when unregistered shares become tradeable, close quote.

THE COURT:  No Tenth Circuit cases?

MR. WATTS:  There are none on point.  We did, however, cite Your Honor to the Joseph V. Wiles decision from the Tenth Circuit, which does define you have to purchase your shares.  But nothing directly on point, no.

You know, in summary, Your Honor, the amended complaint fails to state a claim in three fundamental ways, a lack of falsity, a lack of scienter, and a lack of standing.  Plaintiffs' suggested inference of fraud is not compelling and, in fact, is confusing and confounded by their own alleged facts in their complaint.

Their inference is not as compelling as defendants' proffered non-culpable inference that defendants

disclosed their business strategies and the risks in the registration statement and, thereafter, that these strategies could be very successful for over a year following the IPO, and gave defendants no reason to question them. Then when the baseline risks were exacerbated by industry consolidation in a particular quarter, some of Domo's customers hit the pause button to evaluate their changed options, causing Domo's disappointment during that quarter.

The amended complaint does not plead fraud. It does not plead negligence even. As Your Honor correctly pointed out in last year's matters general particular decision, the securities laws are not meant to provide investors with broad insurance against market losses.

Thank you.

THE COURT: Thank you, Mr. Watts.

Ms. Weinrib, you may proceed.

MS. WEINRIB: Thank you, Your Honor.

Your Honor, I will address the standing issue first simply because that's the last thing that Mr. Watts addressed and that Your Honor had questions about. So I'll start there and then I'll move on to the elements of the Securities Act and Exchange Act claims.

Your Honor, the pleading standard for Section 11 standing is not an elaborate standard. The amended

complaint simply needs to allege that plaintiffs purchased pursuant to or traceable to a registration statement. Defense counsel takes issue with the fact that EXKAE's original purchase took place a year before the IPO. However, at the time of the IPO, an amended S-1 provided that all of those shares converted in a reverse 15 to 1 stock split into shares pursuant to that registration statement.  So at that point in time, those shares were rendered pursuant to that registration statement.

The other two plaintiffs, Mr. Marbach and Ms. Davis, purchased post IPO.  The amended complaint alleges that those purchases were pursuant to the registration statement.  More is not required at this stage, Your Honor, and defense counsel seeks to impose a standard that the securities laws simply don't impose for standing.

Your Honor, Domo is a company that has one product and one product alone, and that product is a cloud-based platform that purports to digitally connect everyone in the company from the CEO on down, and gives them all real-time access to relevant data of that company.

Starting at the point of the IPO, in the offering documents and then throughout the class period, the SEC filings and on earnings calls, defendants issued misleading statements on three separate subjects.  Domo's enterprise business, which defense counsel alluded to the

interpretation of what an enterprise client means, and that that enterprise business accounted for 50 percent of the company's revenues.

The second category was with regard to Domo's international business, which had also strong importance to the company and accounted for nearly a quarter of the company's revenues at all relevant times.

And then the third category of misstatements concerns the company's billings growth rate. Now billings is something that the company has at all relevant times identified as a key business metric, something also of significance to the company.

Now to be more specific, in the offering documents, the misleading statements with regard to defendants' enterprise business included statements regarding their, quote, proven enterprise readiness and noted that that was one of Domo's competitive strengths. They talked about Domo's business strategy in detail. Defendant and I agree on that. They did talk about the business strategy with regard to the enterprise business, but the key here is what they said and what they didn't say.

What they didn't disclose is that their business strategy was extraordinarily deficient, as corroborated by 12 separate confidential witnesses, which included a president of the company at the time of the IPO and a chief

operating officer at the time of the IPO.  All of these confidential witnesses, corroborating one another, speak to the company's unfocused sales pitch, to their focusing on too many business segments trying to sell the product, on consistently shifting their identity and what the product is supposed to do during sales pitches.

THE COURT:  Does a difference of view about various business strategies necessarily indicate that the statements are fraudulent or misleading?

MS. WEINRIB:  It does, Your Honor, when it was something that was corroborated by that many people at the company, and when defendants knew, when they were making their statements, that that business strategy was deficient.

And, in fact, the deficiency was admitted by them at the end of the class period.  It wasn't something that they newly learned when they had disappointing results.  It was something that was talked about at the company repeatedly prior to the IPO through the end of the class period.

And, in fact, post corrected disclosure, the analysts even harped on that point and talked about how defendants were misleading during the class period in their optimism regarding the enterprise business and that their strategy lacked focus and lacked identity.

THE COURT:  Does it matter that they still did

pretty well except for the one quarter?  I take it you think they should have done a lot better?

Go ahead.

MS. WEINRIB:  Your Honor, the issue here is that the case is not about fudged numbers or inaccurate results. The defendants talk a lot about the accuracy of their numbers -- the literal accuracy of their numbers, but the literal accuracy of the numbers is not what the complaint is about.

The complaint is about defendants misstating that they had weakness in their business strategy with regard to enterprise and international, which together led to a deceleration of their billings growth, and that this was a problem that began before the IPO and extended throughout the class period.

And, Your Honor, defendants didn't just limit their misstatements to the enterprise business.  They talked about their international growth as well.  They talked about international growth going forward, the substantial opportunity based on their current expansion efforts, though they were ineffectively spending their marketing money there and weren't growing the international business the way that they were supposed to, and even admitted at the end that it didn't perform.

Now defendants talk about, you know, their

supposed growth, their customer base in enterprise, and their great result in how international kept pace and billings continued to grow.  But this argument ignores defendants' own admission that that enterprise customer base, quote, was insufficient new customer activity to compensate for those efforts, referring to that business strategy that we've been talking about with regards to which they misled investors throughout the class period.

And they further admitted that their international business, quote, didn't perform, despite the fact that in offering documents and throughout the class period, they talked about the strength of international business.

With regards to billings growth, Your Honor, the complaint never alleges that billings stopped altogether. The complaint doesn't allege that there wasn't any growth. The complaint alleges that defendants touted an accelerated year over year growth rate repeatedly when they knew that issues with their enterprise and international businesses, which account for a majority of their revenue collectively, were leading to decelerated billings growth, that that billings growth was slowing down.  And those facts led multiple analysts at the end of the class period to downgrade the stock tremendously and caused the damages at issue here.

Your Honor, defense counsel also referenced this

risk disclosure.  There were risk disclosures in the offering documents and in the SEC filings throughout the class period, but those risk disclosures were misleading in and of themselves.

The risk disclosures talk about risks that are potential, not actual, and they talk about risks that are out of Domo's control, such as seasonal sale cycles, and unexpected implementation challenges with enterprise customers.  But the risk disclosures don't cover the aspects of the risks that were within Domo's control, like their business strategy, like the way they spent their marketing, like whether they focused or overfocused on enterprise customer acquisition.  None of that is mentioned in the risk disclosures and these are the things that ultimately led to the deceleration of the billings growth and to the problems with their reported numbers at the end of the class period.

And, Your Honor, the statements continued beyond the offering documents.  They talked about, quote, success with the big enterprise customers.  They talked about using, quote, the right strategies with these enterprise customers. They did not use the right strategies and they failed to tell investors this during the class period.

They talked about strong performance in enterprise, even though they later admitted it wasn't so strong.  They touted their billings growth.  They talked

about growing very rapidly in international.  They talked about international growth and saying, quote, we can count on continued high growth from them.  None of this was true and, Your Honor, all of these statements were made without revealing that Domo struggled to develop and maintain a consistent go to market strategy as confirmed by the president of the company and the chief operating officer of the company, as well as ten other confidential witnesses that consistently state the same.

They struggled to acquire new enterprise customers because their platform couldn't integrate with these customers' existing data warehouses.  They targeted too many businesses, and they had an ever-shifting identity.  And all these statements that were made in SEC filings and on earnings calls throughout the class period were made with scienter.

There are numerous allegations of scienter in the amended complaint that when assessed holistically create an inference of scienter that is certainly at least as compelling as any opposing inference.  As mentioned previously, we have the statements of 12 confidential witnesses that span a time frame starting before the IPO until after the end of the class period, all telling the same story, and that story is consistent with the truth that was revealed at the end of the class period as well.

We have high-level officers, like the president, talking about how the market was not large and underpenetrated as the company stated in their offering document, about how there was never shifting sales strategy and unfocused, and these were people that had direct contact with defendant James.  And, you know, the chief operating officer was defendant James' right-hand man.  The president had direct conversations with defendant James with regard to the issues with this enterprise business strategy and issues with the international growth.

We also have defendants' own statements.  When assessing scienter, you have to look to what defendants themselves say.  And as defense counsel admitted, they were focused on enterprise, they were focused on international, neither of which is surprising considering just how much of the company's revenue those two aspects of the business contributed, 50 percent for enterprise and 25 percent for international.

They also spoke about both of those subjects comprehensively and repeatedly throughout the class period, answering analysts' questions about these issues.  They say in their Sarbanes-Oxley certification that they designed their controls -- their disclosure controls specifically to ensure that material information about matters discussed in the SEC filings were made known to them.  That includes the

topics at issue here.

We also have allegations regarding defendants' access to information.  The defendants used their own platform.  And as described earlier, their platform, the Domo platform, their one product is designed to give everyone, including the CEO and the CFO on down, access in real time to all relevant data for the company, which in this case included the enterprise client acquisition rate, which included international business growth, and which included billings metrics.

Aside from that platform, they also had a program called Netsuite, which both defendant James and defendant Felt had access to, which also had all this information regarding the billings metrics, and would have alerted them to the deceleration in billings growth that was coming their way because of the issues with enterprise and international businesses.

And, Your Honor, as mentioned repeatedly, they also had only one product.  This was their sole focus. There were no other products for defendants to pay attention to.  It was this and this alone.

And the significance of the enterprise business to the company, again, bears repeating, half of their revenue, and international, a quarter of their revenue.  In fact, with regard to international, defendants even stated

throughout the class period, quote, our long-term growth depends, in part, on being able to expand internationally on a profitable basis, and the identified billings as well as the key business metric.

So all of these allegations, considered holistically, create an inference of scienter and that it's at least as compelling as any opposing inference.

THE COURT:  Thank you.

MS. WEINRIB:  Thank you, Your Honor.

THE COURT:  Mr. Watts, rebuttal?

MR. WATTS:  Yes.  Thank you, Your Honor.

Let me start with Ms. Weinrib's mention of her confidential witnesses, and she highlights two of them, confidential witness 1 and confidential witness 11, mentioning their senior positions within Domo.  I want to remind the Court, as the complaint states, for example, CW1, which is paragraph 40, CW1 left Domo months before the IPO and months before the start of the purported class period. He would have been in no position to know what was going on in the company at any point in time during the class period.

Turning to confidential witness 11, that witness left Domo just two to three months after the IPO, and at a time when Domo was exceeding its projections in both revenue and billings, hitting the cover off the ball.  She mentioned in discussing CW11, that he claimed that Domo's market was,

quote, incredibly crowded and full of competition.  But Domo described its market as many organizations of any size and in any industry that needs or wants to analyze its data in useful ways.  That's a big market.  DOMO's defined market could not have been broader, even if it tried, and it disclosed as much in the registration statement at page nine.

Ms. Weinrib states that her confidential witnesses corroborate one another.  That is not true.  In fact, the two CWs -- use the shorthand -- that she identifies, 1 and 11, contradict each other.  Confidential witness 1 and 11, 1 claims the company was too rigid in its marketing approach.  CW11 says the company strategy changed too frequently, was kind of a scattered, all over the map type of situation.  They don't agree, these two CWs, and therefore should be discounted.

Ms. Weinrib in her statements mentioned repeatedly that the company has one product, the platform.  So I guess individuals should be presumed to know everything about that platform under the corroboration doctrine.  I assume that's where she's headed.  That is ridiculous.

A better description of Domo and its products is the one in the registration statement that said that building Domo was, quote, like building seven start-ups in one because its broad platform comprises, and I quote,

business intelligence, data warehouse, data discovery, analytics, collaboration, dashboarding, visualization, and reporting, that are typically provided in different products by different vendors.

At the time of the IPO, Domo had 1500 customers around the world, including 385 enterprise customers.  It is unreasonable to assume or to argue that the CEO and CFO had intimate knowledge of all 385 customers, let alone DOMO's entire customer set.

Ms. Weinrib a moment ago just mentioned that Messrs. James and Felt should be presumed to have known because they had access to information from DOMO's own platform and from a Netsuite system.  This is a vacuous allegation that does not support falsity or scienter.

First, Domo disclosed billings to investors every single quarter throughout the class period.  This was not a secret known to Domo management and not known to the public. Everyone had access to this information, including investors.

Second, to the extent plaintiffs are intimating that defendants somehow had access to information within the platform or the Netsuite database that provided them with other information, not billings, that told them DOMO's second quarter 2020 billing projections were doomed to fail, they are incorrect.

As Your Honor pointed out in Anderson v. First Security Corp., general allegations that individual defendants had access to information is not sufficient to allege scienter.  Plaintiffs must, quote, specify what the information was and how the information should have alerted each of them that the alleged misstatement was false, close quote.

And as Chief Judge Shelby recently pointed out in the TDC money decision, at page 1228, plaintiffs, quote, must specifically identify the facts a defendant had access to that contained the red flags, close quote.

Here plaintiffs' allegation that Messrs. James and Felt had access, not that they actually accessed the information, to unspecific information, at an unspecific time, that waived an unspecific red flag falls far short of this standard.

THE COURT:  One of plaintiffs' arguments is that -- assuming I understood it correctly -- is that the officers later admitted that they had done some things that were wrong, or didn't make any sense, or weren't as good as they might have been.  What do you say to that?

MR. WATTS:  Yeah.  Hindsight is always 20/20.  And what we know is this, that since before the time of the IPO through the entirety of the class period, defendants told the market they were focused on enterprise and international

customers.  The whole world knew it.  The whole world also knew it was key to their strategy of success marching into the future.

Now you fast-forward five quarters.  At the end of their purported class period, the last quarter, they had disappointing results in one of their two key metrics.  They hit the revenue number.  They missed their billings number by a bit, and only grew at nine percent year over year, not 17 percent.

With that information in hand, after the quarter had ended, they dove through the data, concluded they may have been overfocused on enterprise customers during that last quarter and were going to pivot slightly to go slightly down-market to those that were just not as large in the enterprise space or just below the enterprise space to commercial businesses.  That, again, does not mean that they knew they were overfocused in any prior period, including the quarter just before that quarter in question.

THE COURT:  What else do you want to tell me in rebuttal?  Anything?

MR. WATTS:  Yeah.  One thing on leave to amend, Your Honor.  Defendants respectfully request that the Court dismiss the complaint with prejudice because amendment would be futile.

So an amendment cannot cure plaintiffs' lack of

standing under Section 11.  It cannot explain away the fact that Domo disclosed its business strategies in question and their risks.  It cannot explain away the fact that Domo disclosed the key business metrics of revenue and billings growth every single quarter during the class period.  It cannot explain away the fact that Domo met or exceeded its quarterly forecast for these metrics throughout the class period.  It cannot turn unactionable forward-looking statements and risk factors into misstatements themselves. And it cannot manufacture a strong inference of scienter for a motiveless, profitless fraud based on poorly positioned confidential witnesses who merely disagree with DOMO's chosen business strategies.

Thank you.

THE COURT:  Thank you.

Thank you, all.  I'll take this motion under advisement and get a ruling out in due course.

We'll be in recess.

MR. WATTS:  Thank you.  Have a good day.

MS. WEINRIB:  Thank you, Your Honor.

(Whereupon, the proceeding was concluded.)

C E R T I F I C A T E


          I hereby certify that the foregoing matter is

transcribed from the stenographic notes taken by me and is a

true and accurate transcription of the same.


PATTI WALKER, CSR-RPR-CP       DATED: 12-14-2020
Official Court Reporter
351 South West Temple, #8.431
Salt Lake City, Utah  84101
801-364-5440